### In re MORTON–NORWICH PRODUCTS, INC.

**Appeal No. 81–540.**

United States Court of Customs and Patent Appeals.

Feb. 18, 1982.

Richard J. Egan, Greenville, S. C., for Morton-Norwich Products, Inc.

Joseph F. Nakamura, Sol., Joseph Diamante, Trademark Examiner, and Fred J. McKelvey, Associate Sol., Washington, D. C., for Patent and Trademark Office.

Before MARKEY, Chief Judge, RICH, BALDWIN, MILLER and NIES, Judges.

RICH, Judge.

This appeal is from the ex parte decision of the United States Patent and Trademark Office (PTO) Trademark Trial and Appeal Board (board), 209 USPQ 437 (TTAB 1980), in application serial No. 123,548, filed April 21, 1977, sustaining the examiner's refusal to register appellant's container configuration on the principal register. We reverse the holding on "functionality" and remand for a determination of distinctiveness.

*Background*

Appellant's application seeks to register the following container configuration as a trademark for spray starch, soil and stain removers, spray cleaners for household use, liquid household cleaners and general grease removers, and insecticides:

Appellant owns U.S. Design Patent 238,655, issued Feb. 3, 1976, on the above configuration, and U.S. Patent 3,749,290, issued July 31, 1973, directed to the mechanism in the spray top.

The above-named goods constitute a family of products which appellant sells under the word-marks FANTASTIK, GLASS PLUS, SPRAY 'N WASH, GREASE RELIEF, WOOD PLUS, and MIRAKILL. Each of these items is marketed in a container of the same configuration but appellant varies the color of the body of the container according to the product. Appellant manufactures its own containers and stated in its application (amendment of April 25, 1979) that:

> Since such first use [March 31, 1974] the applicant has enjoyed substantially exclusive and continuous use of the trademark [i.e., the container] which has become distinctive of the applicant's goods in commerce.

The PTO Trademark Attorney (examiner), through a series of four office actions, maintained an unshakable position that the design sought to be registered as a trademark is not distinctive, that there is no evidence that it has become distinctive or has acquired a secondary meaning, that it is "merely functional," "essentially utilitarian," and non-arbitrary, wherefore it cannot function as a trademark. In the second action she requested applicant to "amplify the description of the mark with such particularity that *any portion* of the alleged mark considered to be non functional [sic] is incorporated in the description." (Emphasis ours.) She said, "The Examiner sees none." Having already furnished two affidavits to the effect that consumers spontaneously associate the package design with appellant's products, which had been sold in the container to the number of 132,502,000 by 1978, appellant responded to the examiner's request by pointing out, in effect, that it is the overall configuration of the container rather than any particular feature of it which is distinctive and that it was intentionally designed to be so, supplying several pieces of evidence showing several other containers of different appearance which perform the same functions. Appellant also produced the results of a survey conducted by an independent market research

firm which had been made in response to the examiner's demand for evidence of distinctiveness. The examiner dismissed all of the evidence as "not persuasive" and commented that there had "still not been one iota of evidence offered that the subject matter of this application has been promoted as a trademark," which she seemed to consider a necessary element of proof. She adhered to her view that the design "is no more than a non-distinctive purely functional container for the goods plus a purely functional spray trigger controlled closure * * * essentially utilitarian and non-arbitrary * * *."

Appellant responded to the final rejection with a simultaneously filed notice of appeal to the board and a request for reconsideration, submitting more exhibits in support of its position that its container design was not "purely functional." The examiner held fast to all of her views and forwarded the appeal, repeating the substance of her rejections in her Answer to appellant's appeal brief. An oral hearing was held before the board.

### Board Opinion

The board, citing three cases, stated it to be "well-settled" that the configuration of a container "may be registrable for the particular contents thereof if the shape is non-functional in character, and is, in fact, inherently distinctive, or has acquired secondary meaning as an indication of origin for such goods." In discussing the "utilitarian nature" of the alleged trademark, the board took note of photographs of appellant's containers for FANTASTIK spray cleaner and GREASE RELIEF degreaser, the labels of which bore the words, respectively, "adjustable easy sprayer," and "NEW! Trigger Control Top," commenting that "the advertising pertaining to appellant's goods promotes the word marks of the various products and the desirable functional features of the containers."

In light of the above, and after detailed review of appellant's survey evidence without any specific comment on it, the board concluded its opinion as follows:

After a careful review of the evidence in the case before us, we cannot escape the conclusion that the container for applicant's products, *the configuration* of which it seeks to register, *is dictated primarily by functional (utilitarian) considerations,* and is therefore unregistrable despite any de facto secondary meaning which applicant's survey and other evidence of record might indicate. As stated in the case of *In re Deister Concentrator Company, Inc.* [48 CCPA 952, 289 F.2d 496, 129 USPQ 314 (1961), "not every word or configuration that has a de facto secondary meaning is protected as a trademark." [Emphasis ours.]

### Issues

The parties do not see the issues in the same light. Appellant and the solicitor agree that the primary issue before us is whether the subject matter sought to be registered—the configuration of the container—is "functional."

Appellant states a second issue to be whether the configuration has the capacity to and does distinguish its goods in the marketplace from the goods of others.

The solicitor contends that it would be "premature" for us to decide the second issue if we disagree with the PTO on the first issue and have to reach it, and that we should, in that event, remand the case so the board can "consider" it. Whether to remand is, therefore, an issue.

### OPINION

As would be expected, the arguments made in this court are, except for the remand question, essentially the same as they were below. The question is not new and in various forms we have been over the ground before: is the design sought to be registered "functional"? There is a plethora of case law on this subject and it becomes a question of which precedents to follow here—and why. In our view, it would be useful to review the development of the principles which we must apply in order to better understand them. In doing

so, it should be borne in mind that this is not a "configuration of *goods*" case but a "configuration of the *container for* the goods" case. One question is whether the law permits, on the facts before us, exclusive appropriation of the precise configuration described in the application to register. Another facet of the case is whether that configuration in fact functions as a trademark so as to be entitled to registration. We turn first to a consideration of the development of the law on "functionality."

A trademark is defined as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant *to identify his goods* and distinguish them from those manufactured or sold by others" (emphasis ours). 15 U.S.C. § 1127 (1976). Thus, it was long the rule that a trademark must be something other than, and separate from, the merchandise to which it is applied. *Davis v. Davis*, 27 F. 490, 492 (D.Mass.1886); *Moorman v. Hoge*, 17 F.Cas. 715, 718–19 (C.C.D. Cal.1871) (No. 9,783). *Accord, Goodyear Tire & Rubber Co. v. Robertson*, 18 F.2d 639, 641 (D.Md.1927), aff'd, 25 F.2d 833 (4th Cir. 1928); *Capewell Horse Nail Co. v. Mooney*, 167 F. 575, 590–91 (N.D.N.Y.), aff'd, 172 F. 826 (2d Cir. 1909); *Fairbanks v. Jacobus*, 8 F.Cas. 951, 952 (C.C.S.D.N.Y. 1877) (No. 4,608).

Aside from the trademark/product "separateness" rationale for not recognizing the bare design of an article or its container as a trademark, it was theorized that all such designs would soon be appropriated, leaving nothing for use by would-be competitors. One court, for example, feared that "The forms and materials of packages to contain articles of merchandise * * * would be rapidly taken up and appropriated by dealers, until some one, bolder than the others, might go to the very root of things, and claim for his goods the primitive brown paper and tow string, as a peculiar property." *Harrington v. Libby*, 11 F.Cas. 605, 606 (C.C.S.D.N.Y.1877) (No. 6,107). *Accord, Diamond Match Co. v. Saginaw Match Co.*, 142 F. 727, 729–30 (6th Cir. 1906).

This limitation of permissible trademark subject matter later gave way to assertions that one or more *features* of a product or package design could legally function as a trademark. *E.g., Alan Wood Steel Co. v. Watson*, 150 F.Supp. 861, 863, 113 USPQ 311, 312 (D.D.C.1957); *Capewell Horse Nail Co. v. Mooney*, supra. It was eventually held that the *entire* design of an article (or its container) could, without other means of identification, function to identify the source of the article and be protected as a trademark. *E.g., In re Minnesota Mining and Manufacturing Co.*, 51 CCPA 1546, 1547–48, 335 F.2d 836, 837, 142 USPQ 366, 367 (1964).

That protection was limited, however, to those designs of articles and containers, or features thereof, which were "nonfunctional." *See generally*, L. Amdur, *Trade-Mark Law and Practice* §§ 5–7 (1948); R. Callmann, *Unfair Competition Trade-Marks and Monopolies* §§ 71.4, 77.4(e) and 98.4(d) (1967); W. Derenberg, *Trade-Mark Protection and Unfair Trading* § 24 (1936); J. Gilson, *Trademark Protection and Practice* § 2.13 (1974); J. McCarthy, *Trademarks and Unfair Competition* §§ 7:23–7:35 (1973); H. Nims, *Unfair Competition and Trade-Marks* §§ 134–40 (1947); 63 C.J. *Trade-Marks* §§ 57–58, 129 and 132 (1933); 87 C.J.S. *Trade-Marks* §§ 48–49, 118 (1954). This requirement of "nonfunctionality" is not mandated by statute, but "is deduced entirely from court decisions." *In re Mogen David Wine Corp.*, 51 CCPA 1260, 1269, 328 F.2d 925, 932, 140 USPQ 575, 581 (1964) (Rich, J., concurring). It has as its genesis the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be *temporarily* denied by the patent or copyright laws:

If one manufacturer should make an advance in effectiveness of operation, or in simplicity of form, or in utility of color; and if that advance did not entitle him to a monopoly by means of a machine or process or a product or a design patent; and if by means of unfair trade suits he could shut out other manufacturers who plainly intended to share in the bene-

fits of unpatented utilities * * * he would be given gratuitously a monopoly more effective than that of the unobtainable patent in the ratio of eternity to seventeen years. [*Pope Automatic Merchandising Co. v. McCrum-Howell Co.*, 191 F. 979, 981–82 (7th Cir. 1911).]

*Best Lock Corp. v. Schlage Lock Co.*, 56 CCPA 1472, 1476, 413 F.2d 1195, 1199, 162 USPQ 552, 555 (1969); *In re Deister Concentrator Co.*, 48 CCPA 952, 960, 289 F.2d 496, 499, 129 USPQ 314, 318 (1961); *Sylvania Electric Products, Inc. v. Dura Electric Lamp Co.*, 247 F.2d 730, 732, 114 USPQ 434, 436 (3d Cir. 1957); *Herz v. Loewenstein*, 40 App.D.C. 277, 278 (1913); *Alan Wood Steel Co. v. Watson*, 150 F.Supp. 861, 862, 113 USPQ 311, 312 (D.D.C.1957); *Goodyear Tire & Rubber Co. v. Robertson*, 18 F.2d 639, 641 (D.Md.1927), *aff'd*, 25 F.2d 833 (4th Cir. 1928).

■ An exception to the right to copy exists, however, where the product or package design under consideration is "nonfunctional" and serves to identify its manufacturer or seller, and the exception exists even though the design is *not* temporarily protectible through acquisition of patent or copyright. Thus, when a design is "nonfunctional," the right to compete through imitation gives way, presumably upon balance of that right with the originator's right to prevent others from infringing upon an established symbol of trade identification.

This preliminary discussion leads to the heart of the matter—how do we define the concept of "functionality," and what role does the above balancing of interests play in that definitional process?

### I. Functionality Defined

Many courts speak of the protectability as trademarks of product and package configurations in terms of whether a particular design is "functional" or "nonfunctional." Without proper definition, however, such a distinction is ' useless for determining whether such design is registrable or protectable as a trademark, for the label "functional" has dual significance. It has been used, on the one hand, in lay fashion to indicate "the normal or characteristic action of anything," and, on the other hand, it has been used to denote a legal conclusion. *Compare, In re Penthouse International Ltd.*, 565 F.2d 679, 681, 195 USPQ 698, 699–700 (CCPA 1977) (If the product configuration "has a non-trademark function, the inquiry is not at an end; possession of a function and of a capability of indicating origin are not in every case mutually exclusive."), *with In re Mogen David Wine Corp.*, 51 CCPA supra at 1270, 328 F.2d at 933, 140 USPQ at 582 (Rich, J., concurring) ("The Restatement appears to use the terms 'functional' and 'nonfunctional' as labels to denote the legal consequence: if the former, the public may copy; and if the latter, it may not. This is the way the 'law' has been but it is not of much help in deciding cases.").

Accordingly, it has been noted that one of the "distinct questions" involved in "functionality" reasoning is, "In what *way* is [the] subject matter functional or utilitarian, factually or legally?" *In re Honeywell, Inc.*, 497 F.2d 1344, 1350, 181 USPQ 821, 826 (CCPA 1974) (Rich, J., concurring). This definitional division, noted in "truism" (4) in *Deister*, leads to the resolution that if the designation "functional" is to be utilized to denote the *legal* consequence, we must speak in terms of de facto functionality and de jure functionality, the former being the use of "functional" in the lay sense, indicating that although the design of a product, a container, or a feature of either is directed to performance of a function, it *may* be legally recognized as an indication of source. De jure functionality, of course, would be used to indicate the opposite—such a design may not be protected as a trademark.

This is only the beginning, however, for further definition is required to explain *how* a determination of whether a design is de jure functional is to be approached. We start with an inquiry into "utility."

*A. "Functional" means "utilitarian"*[1]

From the earliest cases, "functionality" has been expressed in terms of "utility." In 1930, this court stated it to be "well settled that the configuration of *an article having utility* is not the subject of trade-mark protection." (Emphasis ours.) *In re Dennison Mfg. Co.*, 17 CCPA 987, 988, 39 F.2d 720, 721, 5 USPQ 316, 317 (1930) (Arbitrary urn or vase-like shape of reinforcing patch on a tag.). *Accord, Sparklets Corp. v. Walter Kidde Sales Co.*, 26 CCPA 1342, 1345, 104 F.2d 396, 399, 42 USPQ 73, 76 (1939); *In re National Stone-Tile Corp.*, 19 CCPA 1101, 1102, 57 F.2d 382, 383, 13 USPQ 11, 12 (1932). This broad statement of the "law", that the design of an article "having utility" cannot be a trademark, is incorrect and inconsistent with later pronouncements.

██ We wish to make it clear—in fact, we wish to characterize it as the *first* addition to the *Deister* "truisms"—that a discussion of "functionality" is *always* in reference to the *design* of the thing under consideration (in the sense of its *appearance*) and *not* the thing itself. One court, for example, paraphrasing Gertrude Stein, commented that "a dish is a dish is a dish." *Hygienic Specialties Co. v. H. G. Salzman, Inc.*, 302 F.2d 614, 621, 133 USPQ 96, 103 (2d Cir. 1962). No doubt, by definition, a dish always functions as a dish and has its utility, but it is the appearance of the dish which is important in a case such as this, as will become clear.

Assuming the *Dennison* court intended that its statement reference an article whose *configuration* "has utility," its statement is still too broad. Under that reasoning, the design of a particular article would be protectable as a trademark only where

the design was useless, that is, wholly unrelated to the function of the article. For example, where a merchant sought to register on the supplemental register the overall configuration of a triangular chemical cake for use in a process of metal plating, this court stated that the shape was capable of becoming a trademark because it "is entirely arbitrary and, except for its solidity (*all* shapes being solid), has no functional significance whatever." *In re Minnesota Mining and Mfg. Co.*, 51 CCPA supra at 1551, 335 F.2d at 840, 142 USPQ at 369.

Most designs, however, result in the production of articles, containers, or features thereof which are indeed utilitarian, and examination into the possibility of trademark protection is not to the mere *existence* of utility, but to the *degree* of design utility. The ore concentrating and coal cleaning table shape in *Deister*, for example, was refused registration as a trademark because · its shape was "*in essence* utilitarian," 48 CCPA supra at 968, 289 F.2d at 506, 129 USPQ at 322. Likewise, the design of a cast aluminum fitting for joining lengths of tubing together was denied registration because it was held to be "in essence utilitarian or functional." *In re Hollaender Mfg. Co.*, 511 F.2d 1186, 1189, 185 USPQ 101, 103 (CCPA 1975). The configuration of a thermostat cover was also refused registration because a round cover was "probably * * * the most utilitarian" design which could have been selected for a round mechanism. *In re Honeywell, Inc.*, 532 F.2d 180, 182, 189 USPQ 343, 344 (CCPA 1976).

Thus, it is the "utilitarian" *design* of a "utilitarian" *object* with which we are concerned, and the manner of use of the term "utilitarian" must be examined at each oc-

---

1. It is well known that the law of "functionality" has been applied in both a "utilitarian" sense and in terms of "aesthetics." *See e.g., Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 210 USPQ 351 (9th Cir. 1981); *International Order of Job's Daughters v. Lindeburg and Co.*, 633 F.2d 912, 208 USPQ 718 (9th Cir. 1980); *Famolare, Inc. v. Melville Corp.*, 472 F.Supp. 738, 203 USPQ 68 (D.Hawaii 1979). Recognition of this provides an explanation for the statement that, "the term 'functional' is not to be treated as synonymous

with the literal significance of the term 'utilitarian'." *J.C. Penney Co. v. H.D. Lee Mercantile Co.*, 120 F.2d 949, 954, 50 USPQ 165, 170 (8th Cir. 1941). It will be so treated, however, where the issue is one of "utilitarian functionality" and not "aesthetic functionality." The PTO does not argue in this case that appellant's container configuration is aesthetically functional, notwithstanding appellant's argument that its design was adopted, in part, for aesthetic reasons.

currence. The latter occurrence is, of course, consistent with the lay meaning of the term. But the former is being used to denote a *legal consequence* (it being synonymous with "functional"), and it therefore requires further explication.

B. *"Utilitarian" means "superior in function (de facto) or economy of manufacture," which "superiority" is determined in light of competitive necessity to copy*

█ Some courts have stated this proposition in the negative. In *American-Marietta Co. v. Krigsman*, 275 F.2d 287, 289, 124 USPQ 320, 322 (2d Cir. 1960), the court stated that "those features of the original goods that are not in any way essential to their use" may be termed "nonfunctional." But what does this statement mean? In the case at bar, for example, we cannot say that it means that the subject *design* is "functional" merely because a hollow body, a handhold, and a pump sprayer are "essential to its use." What this phrase must mean is not that the generic *parts* of the article or package are essential, but, as noted above, that the particular *design* of the whole assembly of those parts must be essential. This, of course, leaves us to define "essential to its use," which is also the starting place for those courts which have set forth in positive fashion the reasons they believe that some product or package designs are not protectible as trademarks and thus not registrable.

In *Luminous Unit Co. v. Williamson*, 241 F. 265 (N.D.Ill.1917), the court noted that "the owner of a fixture, machine, or device, patented or unpatented, who has obtained a trade in it, may simply exclude others from taking away that trade when they deceive the purchasing public as to the origin of the goods sold by them." *Id.* at 268. The court went on to state an exception to this rule, which is the public right to copy those "Necessary elements of mechanical construction, essential to the practical operation of a device, and which cannot be changed without either lessening the efficiency or materially increasing expense."

*Id.* at 269. The court in *Diamond Match Co. v. Saginaw Match Co.*, 142 F. 727, 729 (6th Cir. 1906), was of the same opinion. In response to a claim that the defendant was engaging in unfair competition by marketing matches with composite heads in two colors, the court, noting that the match was not protected by patent, stated that he who has a right to make a tipped match "has a right to put on it a head of two colors, so as to distinguish the tip on which the match should be struck, from the head itself. The two colors, therefore, serve not only a useful purpose but an essential function, for the very essence of the tipped match is the tip itself, which must be marked out by a color of its own." Another court framed the issue this way: Is the subject matter "made in the form it must be made if it is to accomplish its purpose"? *Marvel Co. v. Tullar Co.*, 125 F. 829, 830 (S.D.N.Y.1903).

Thus, it is clear that courts in the past have considered the public policy involved in this area of the law as, not the *right* to slavishly copy articles which are not protected by patent or copyright, but the *need* to copy those articles, which is more properly termed the right to compete *effectively*. Even the earliest cases, which discussed protectability in terms of exhaustion of possible packaging forms, recognized that the real issue was whether "the effect would be to gradually throttle trade." *Harrington v. Libby*, supra at 606.

More recent cases also discuss "functionality" in light of competition. One court noted that the "question in each case is whether protection against imitation will hinder the competitor in competition." *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1218, 191 USPQ 79, 85 (8th Cir. 1976). Another court, upon suit for trademark infringement (the alleged trademark being plaintiff's building design), stated that "enjoining others from using the building design [would not] inhibit competition in any way." *Fotomat Corp. v. Cochran*, 437 F.Supp. 1231, 1235, 194 USPQ 128, 131 (D.Kan.1977). This court has also referenced "hinderance of competition" in a number of the "functionality" cases which have been argued before it.

*E.g., In re Penthouse International Ltd.,* 565 F.2d supra at 682, 195 USPQ at 700–701 (Would protection of the design "hinder competition"?); *In re Mogen David Wine Corp.,* 51 CCPA supra at 1270, 328 F.2d at 933, 140 USPQ at 581 (Rich, J., concurring, cited with approval in *Penthouse International,* supra, stated that, "Whether competition would in fact be hindered is really the crux of the matter.").

The Restatement of Torts, § 742, designates a design of goods as "functional" if it "*affects* their purpose, action or performance, or the facility or economy of processing, handling or using them * * *." (Emphasis ours.) To ensure that use of the word "affects" was clear, Comment *a* to that section indicates that a "feature" may be found "functional" if it "contributes to" the utility, durability, effectiveness or ease of use, or the efficiency or economy of manufacture of that "feature." Excusing the fact that the *design* of the "feature" is not referenced, and equating "feature" with "design," this seems to take us back to where we started—with those cases that deny trademark protection to those articles "having utility." Further, it appears to us that "affects" and "contributes to" are both so broad as to be meaningless, for every design "affects" or "contributes to" the utility of the article in which it is embodied. "Affects" is broad enough to include a design which *reduces* the utility or the economy of manufacture.

Although the Restatement appears to ignore the policies which created the law of "functionality," it is noted at the end of the first paragraph of Comment *a* to § 742, in accord with the cases previously discussed, that we should examine whether prohibition of imitation by others will "deprive them of something which will substantially hinder them in competition." [2]

Given, then, that we must strike a balance between the "right to copy" and the right to protect one's method of trade iden-

tification, *In re Mogen David Wine Corp.,* 51 CCPA supra at 1270, 328 F.2d at 933, 140 USPQ at 582 (Rich, J., concurring); *In re Deister Concentrator Co.,* 48 CCPA supra at 966, 289 F.2d at 504, 129 USPQ at 322, what weights do we set upon each side of the scale? That is, given that "functionality" is a question of fact, *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 775, 210 USPQ 351, 356 (9th Cir. 1981); *In re Hollaender Mfg. Co.,* 511 F.2d supra at 1188, 185 USPQ at 102; *In re Deister Concentrator Co.,* 48 CCPA supra at 966, 289 F.2d at 504, 129 USPQ at 322; *Sparklets Corp. v. Walter Kidde Sales Co.,* 26 CCPA supra at 1345, 104 F.2d at 399, 42 USPQ at 76, what facts do we look to in determining whether the "consuming public has an interest in making use of [one's design], superior to [one's] interest in being [its] sole vendor"? *Vaughan Novelty Mfg. Co. v. G. G. Greene Mfg. Corp.,* 202 F.2d. 172, 176, 96 USPQ 277, 280 (3d Cir.), *cert. denied,* 346 U.S. 820, 74 S.Ct. 34, 98 L.Ed. 346, 99 USPQ 491 (1953).

## II. Determining "Functionality"

### A. In general

■ Keeping in mind, as shown by the foregoing review, that "functionality" is determined in light of "utility," which is determined in light of "superiority of design," and rests upon the foundation "essential to effective competition," *Ives Laboratories, Inc. v. Darby Drug Co.,* 601 F.2d 631, 643, 202 USPQ 548, 558 (2d Cir. 1979), and cases cited supra, there exist a number of factors, both positive and negative, which aid in that determination.

Previous opinions of this court have discussed what evidence is useful to demonstrate that a particular design is "superior." In *In re Shenango Ceramics, Inc.,* 53 CCPA 1268, 1273, 362 F.2d 287, 291, 150 USPQ 115, 119 (1966), the court noted that the existence of an expired utility patent which dis-

---

**2.** This follows immediately a discussion of "aesthetic functionality." Courts, however, have generally interpreted the statement as endorsing an inquiry into the effect upon competition in cases where the issue is one of "utilita-

rian functionality." *E.g., In re Penthouse International Ltd.,* 565 F.2d supra at 682, 195 USPQ at 700–701 (citing with approval the concurring opinion in *Mogen David Wine Corp.,* supra.).

closed the *utilitarian advantage of the design* sought to be registered as a trademark was *evidence* that it was "functional." *Accord, Best Lock Corp. v. Schlage Lock Co.,* 56 CCPA supra at 1477, 413 F.2d at 1199, 162 USPQ at 556; *Mine Safety Appliances Co. v. Storage Battery Co.,* 56 CCPA 863, 864, 405 F.2d 901, 902, 160 USPQ 413, 414 (1969); *In re Deister Concentrator Co.,* 48 CCPA supra at 962, 289 F.2d at 501, 129 USPQ at 319; *Daniel v. Electric Hose & Rubber Co.,* 231 F. 827, 833 (3d Cir. 1916). It may also be significant that the originator of the design touts its utilitarian advantages through advertising. *Shenango,* supra; *Deister,* supra; *Mine Safety Appliances,* supra; *In re Pollak Steel Co.,* 50 CCPA 1045, 1046–47, 314 F.2d 566, 567, 136 USPQ 651, 652 (1963).

■ Since the effect upon competition "is really the crux of the matter," it is, of course, significant that there are other alternatives available. Nims, *Unfair Competition and Trade-Marks* at 377; *compare, Time Mechanisms, Inc. v. Qonaar Corp.,* 422 F.Supp. 905, 913, 194 USPQ 500, 506 (D.N.J. 1976) ("the parking meter mechanism can be contained by housings of many different configurations") *and In re World's Finest Chocolate, Inc.,* 474 F.2d 1012, 1014, 177 USPQ 205, 206 (CCPA 1973) ("We think competitors can readily meet the demand for packaged candy bars by use of other packaging styles, and we find no utilitarian advantages flowing from this package design as opposed to others as was found in the rhomboidally-shaped deck involved in *Deister.*") *and In re Mogen David Wine Corp.,* 51 CCPA supra at 1270, 328 F.2d at 933, 140 USPQ at 581 (Rich, J., concurring. "Others can meet any real or imagined demand for wine in decanter-type bottles—assuming there is any such thing—without being in the least hampered in competition by inability to copy the Mogen David bottle design.") *and In re Minnesota Mining and Mfg. Co.,* 51 CCPA supra at 1551, 335 F.2d at 840, 142 USPQ at 369 (It was noted to be an undisputed fact of record that the article whose design was sought to be registered "could be formed into almost any shape.") *and Fotomat Corp. v. Cochran,* 437 F.Supp.

supra at 1235, 194 USPQ at 131 (The court noted that the design of plaintiff's building functioned "no better than a myriad of other building designs.") *with In re Honeywell, Inc.,* 532 F.2d at 182, 189 USPQ at 344 (A portion of the board opinion which the court adopted noted that there "are only so many basic shapes in which a thermostat or its cover can be made," but then concluded that, "The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.").

It is also significant that a particular design results from a comparatively simple or cheap method of manufacturing the article. In *Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.,* 339 F.Supp. 973, 980, 172 USPQ 14, 19 (M.D.Tenn.1971), *aff'd,* 470 F.2d 975, 176 USPQ 161 (6th Cir. 1972), the court stated its reason for refusing to recognize the plaintiff's bicycle rim surface design as a trademark:

> The evidence is uncontradicted that the various manufacturers of bicycle rims in the United States consider it commercially necessary to mask, hide or camouflage the roughened and charred appearance resulting from welding the tubular rim sections together. The evidence represented indicates that the only other process used by bicycle rim manufacturers in the United States is the more complex and more expensive process of grinding and polishing.

*Accord, In re Pollak Steel Co.,* 50 CCPA supra at 1050, 314 F.2d at 570, 136 USPQ at 654; *Luminous Unit Co. v. R. Williamson & Co.,* supra at 269.

### B. The case at bar

#### 1. The evidence of functionality

■ We come now to the task of applying to the facts of this case the distilled essence of the body of law on "functionality" above discussed. The question is whether appellant's plastic spray bottle is de jure functional; is it the best or one of a few superior designs available? We hold,

on the basis of the evidence before the board, that it is not.

The board thought otherwise but did not state a single supporting reason. In spite of her strong convictions about it, neither did the examiner. Each expressed mere opinions and it is not clear to us what either had in mind in using the terms "functional" and "utilitarian." Of course, the spray bottle is highly useful and performs its intended functions in an admirable way, but that is not enough to render the *design* of the spray bottle—which is all that matters here—functional.

As the examiner appreciated, the spray bottle consists of two major parts, a bottle and a trigger-operated, spray-producing pump mechanism which also serves as a closure. We shall call the latter the spray top. In the first place, a molded plastic bottle can have an infinite variety of forms or designs and still *function* to hold liquid. No one form is *necessary* or appears to be "superior." Many bottles have necks, to be grasped for pouring or holding, and the necks likewise can be in a variety of forms. The PTO has not produced one iota of evidence to show that the shape of appellant's bottle was *required* to be as it is for any de facto functional reason, which might lead to an affirmative determination of de jure functionality. The evidence, consisting of competitor's molded plastic bottles for similar products, demonstrates that the same functions can be performed by a variety of other shapes with no sacrifice of any functional advantage. There is no necessity to copy appellant's trade dress to enjoy any of the functions of a spray-top container.

As to the appearance of the spray top, the evidence of record shows that it too can take a number of diverse forms, all of which are equally suitable as housings for the pump and spray mechanisms. Appellant acquired a patent on the pump mechanism (No. 3,749,290) the drawings of which show it embodied in a structure which bears

not the slightest resemblance to the appearance of appellant's spray top. The pictures of the competition's spray bottles further illustrate that no particular housing *design* is necessary to have a pump-type sprayer. Appellant's spray top, seen from the side, is rhomboidal, roughly speaking, a design which bears no relation to the shape of the pump mechanism housed within it and is an arbitrary decoration—no more de jure functional than is the grille of an automobile with respect to its under-the-hood power plant. The evidence shows that even the shapes of pump triggers can and do vary while performing the same function.

What is sought to be registered, however, is no single design feature or component but the overall composite design comprising both bottle and spray top. While that design must be *accommodated* to the functions performed, we see no evidence that it was *dictated* by them and resulted in a functionally or economically superior design of such a container.

Applying the legal principles discussed above, we do not see that allowing appellant to exclude others (upon proof of distinctiveness) from using this trade dress will hinder competition or impinge upon the rights of others to compete effectively in the sale of the goods named in the application, even to the extent of marketing them in *functionally* identical spray containers. The fact is that many others are doing so. Competitors have apparently had no need to simulate appellant's trade dress, in whole or in part, in order to enjoy all of the *functional* aspects of a spray top container. Upon expiration of any patent protection appellant may now be enjoying on its spray and pump mechanism, competitors may even copy and enjoy all of its functions without copying the external appearance of appellant's spray top.[3]

If the functions of appellant's bottle can be performed equally well by containers of innumerable designs and, thus, no one is

---

**3.** It is interesting to note that appellant also owns design patent 238,655 for the design in issue, which, at least presumptively, indicates that the design is *not de jure* functional. *See In*

*re Schilling*, 421 F.2d 747, 750, 164 USPQ 576, 578 (CCPA 1970); *In re Garbo*, 48 CCPA 845, 848, 287 F.2d 192, 193–94, 129 USPQ 72, 73 (1961).

injured in competition, why did the board state that appellant's *design* is functional and for that reason not registrable?

## 2. *The relationship between "functionality" and distinctiveness*

■ One who seeks to register (or protect) a product or container configuration as a trademark must demonstrate that its design is "nonfunctional," as discussed above, and that the design functions as an indication of source, whether inherently so, because of its distinctive nature, *In re McIlhenny*, 47 CCPA 985, 989, 278 F.2d 953, 955, 126 USPQ 138, 141 (1960); *In re International Playtex Corp.*, 153 USPQ 377, 378 (TTAB 1967), or through acquisition of secondary meaning. These two requirements must, however, be kept separate from one another.

The issues of distinctiveness and functionality may have been somewhat intermixed by the board. The design in issue appears to us to be relatively simple and plain, and the board, although not ruling upon appellant's contention that its design has acquired secondary meaning, discussed only distinctiveness before reaching its conclusion that the design was "functional." The unexpressed (and perhaps unconscious) thought may have been that if something is not inherently distinctive (appellant admits that its design is not), perhaps even austere, then, since it does not at a particular time function as a legally recognized indication of source, it probably never will. And since it is so plain that one may believe it is not and never will be a trademark, it will be perceived—not that the design is not inherently distinctive—but that it is "functional," without analysis of why it is believed to be "functional." The sole criterion seems to have been that the design is ordinary.[4]

While it is certainly arguable that lack of distinctiveness may, where appropriate, permit an inference that a design was created primarily with an eye toward the utility of the *article*, that fact is by no means conclusive as to the "functionality" of the *design* of that article. Whether in fact the design is "functional" requires closer and more careful scrutiny. We cannot say that there exists an inverse proportional relationship in all cases between distinctiveness of design and functionality (de facto or de jure).

■ This relationship—that a nondistinctive design does not necessarily equal a "functional" design—we will term the *second* addition to the *Deister* "truisms."

This court's past opinions which indicate that a particular design is "nonfunctional" because it is "arbitrary" are not to be construed as contrary to this additional truism. *E.g., In re Deister Concentrator Co.*, 48 CCPA supra at 968, 289 F.2d at 506, 129 USPQ at 323; *In re Mogen David Wine Corp.*, 51 CCPA at 1270, 328 F.2d at 933, 140 USPQ at 582 (Rich, J., concurring). In this situation, "arbitrary" is not used in the typical trademark (distinctiveness) sense of the word. It is used to indicate a design which may have been selected without complete deference to utility and, thus, is most likely "nonfunctional." That is, it is used to indicate the opposite side of the "functional" coin, since a design can be inherently distinctive (the usual trademark law meaning of the word "arbitrary") and still be "functional."

## 3. *Distinctiveness and the question of remand*

■ It is the solicitor's view, after consultation with the Chairman of the Trademark Trial and Appeal Board, that the board rendered no decision on the issues of

---

4. Perhaps the solicitor was of the same opinion. Continually referencing "the container," he concluded that, " 'Essentially functional' subject matter is just that—it doesn't matter whether it results in a competitive edge or not. Either way, essentially functional subject matter is not registrable."

We have refrained from using phrases such as "essentially functional," "primarily function-

al," and "dictated primarily by functional considerations" to denote the legal consequence, all of which use the word "functional" in the lay sense of the term. If, in the *legal* sense, a particular *design* is functional, such adverbs as "essentially" and "primarily" are without meaning. Either a design is functional (de jure) or it is not.

distinctiveness or secondary meaning, notwithstanding the fact that the board devoted over a third of its opinion to a discussion of the survey evidence which pertains to those issues. We are constrained to agree.

However, the solicitor further stated that upon remand the board would like to raise questions about the preparation of the survey evidence "on grounds not advanced by the examiner," specifically, "whether the survey was conducted in accordance with accepted principles of survey research." Three references to legal literature have been cited which we have not examined since they relate only to a question which may arise in the future and is clearly not before us.

The solicitor also stated that "fundamental fairness dictates that appellant be given an opportunity to meet those new grounds with such argument or additional evidence as it deems appropriate."

In the face of the prospect of such a new rejection of the application upon return of this case to the PTO, notwithstanding our reversal of the only decision clearly made, we have decided that it is in appellant's interest to grant the solicitor's requested remand. In light of this decision, we have not considered the distinctiveness issue or the survey evidence thereon since these involve unfinished administrative business. We grant the remand with a reminder of what we said with respect to a somewhat similar situation in *In re Water Gremlin Co.*, 635 F.2d 841, 845, 208 USPQ 89, 92 (CCPA 1980):

> Where the board perceives a ground of rejection not asserted by the examiner, basic fairness requires that the applicant be given an opportunity to develop and present its position *before any ruling is made.* [Emphasis ours.]

 In view of our decision to remand and the further objection to appellant's survey evidence which has been foretold by the solicitor, it also seems appropriate to repeat what this court pointed out in *DeWalt, Inc. v. Magna Power Tool Corp.*, 48 CCPA 909, 915–16, 289 F.2d 656, 659–60, 129 USPQ 275, 279 (1961), namely, that trademark

rights are not static and that the right to register must be determined on the basis of the factual situation as of the time when registration is being sought. What we have in mind is that the factual situation may be different in 1982 than it was in May 1978 when appellant had the survey conducted. Appellant may have begun emphasizing to the public that it regards its container design as a trademark, and there is certain to be a difference in total volume of sales of products in the spray containers here involved and in the advertising expenditures made in connection therewith. It is possible that associations in the collective minds of purchasers, actual and prospective, have changed.

The decision of the board on is *reversed* and the case is *remanded* for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

