The STEP COMPANY, Plaintiff,

v.

CONSUMER DIRECT, INC. d/b/a
Fitness Quest, Defendant.

Civil Action No. 1:93–CV–0252–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 29, 1994.

Anthony B. Askew, Daniel James Warren, Jones & Askew, Atlanta, GA, for plaintiff.

Jerre B. Swann, Theodore Harris Davis, Kilpatrick & Cody, Atlanta, GA, for defendant.

## ORDER

FORRESTER, District Judge.

This matter is before the court on Plaintiff's and Defendant's cross-motions for summary judgment. As a preliminary matter, Plaintiff's motion for leave to exceed the page limitation on its brief in support of its motion for summary judgment [15–1] is GRANTED.

## I. FACTS

### A. *Background*

This action arises from Plaintiff's allegations that Defendant is infringing on its design patent and has appropriated the trade dress of its step aerobics bench. Step aerobics is a method of exercise in which participants combine various arm and leg motions with the action of stepping onto and off of a "bench," the height of which adjusts according to the exerciser's physical ability. In 1989, step aerobics classes were offered at Sportslife, an Atlanta health club. The benches then used were made of plywood and presented several problems. Each bench was a fixed height, and having a sufficient number of each height of bench for class members was sometimes difficult. The plywood benches were heavy, hard to move, and difficult to store, and they were not particularly attractive. Finally, the plywood benches could become slick as the exerciser perspired, and their sharp edges and corners could produce injury.

### B. *Plaintiff's Product*

On June 19, 1989, Lyle Irwin, then a Sportslife shareholder, proposed the idea of

an adjustable step bench. In August, Irwin, Richard Boggs, another Sportslife shareholder, and others formed Sports Step, Inc., Plaintiff's predecessor. Boggs and Irwin consulted with William J. Saunders and Samuel Crosby of Industrial Design Associates, Inc., and requested that they work from rough sketches to design an attractive, marketable product. Saunders and Crosby developed a high density polyethylene, blow-molded bench which is approximately thirty-six inches long and four inches tall. The edges and corners of the bench are rounded, and the top of the bench is covered with a ribbed, black, extruded mat, which extends over the longitudinal edge of the bench. This base unit may be raised by attaching one or two smaller, almost square risers, each two inches tall, to the bottom of each end of the bench to create a twin tower effect. Each piece of the bench has a semi-gloss texture and is brightly colored.

The health club version of Plaintiff's product, the "Step®" has a teal base unit with the black mat and one set of purple and one set of gray risers. The home version, which is identical except in color to the club Step®, has a lighter teal base with a black mat and one set of purple and one set of pink risers. The bench has a number of safety advantages resulting from the rounded edges and the black non-skid mat; it is adjustable and easily stored; the material and method of manufacture create a "cushioning" effect which absorbs the shock created each time the exerciser steps on the bench; and it is attractive to look at because of its shape and its bright colors.

In October of 1989, Plaintiff consulted with QPI, a leading blow-molding company, which recommended several changes to the bench. The parting line [1] was located below the center line of the bench, which tended to cause the bench to warp into a slightly convex shape, and Charles Chirdon, QPI's technical manager, recommended moving the parting line higher up on the bench in order to avoid that tendency. Chirdon also recommended changing the method of affixing the mat to the top of the bench in order to eliminate the problem of having the mat peel up from the edges of the bench; producing the bench in a smaller size so as to reduce the cost and time involved in manufacture; and using textured dies, which would reduce the number of units that would have to be scrapped due to the visibility of die lines and color streaking, which show more clearly on a semi-gloss surface than on a textured surface. Plaintiff rejected each of these design-oriented suggestions and claims each of the retained elements, as well as the asymmetrical longitudinal and end angles and the rounded edge on the bottom of the bench, to be non-functional elements.

The Step® was first displayed in October of 1989 at a club industry trade show in Chicago. The Step® was first delivered to customers in January of 1990, and it enjoyed immediate success. The Step® is widely used in health clubs and has been featured in many magazine and newspaper articles and has been used as a prop in many step aerobics instructional videotapes and on several television shows. Plaintiff has received two industry awards for the introduction of the Step®.

The club version of the Step® was originally marketed under a license agreement with Reebok International, Inc. ("Reebok"), so that it carried the Reebok® mark as well as the Step® mark and was advertised with Reebok. When Reebok introduced its own bench in February of 1992, the Reebok® was no longer used. Plaintiff has expended significant amounts of money on advertising, using print, television, and billboard ads, and producing "infomercials," which function both as advertisements and as sales opportunities.

On October 5, 1990, Saunders and Crosby applied for a design patent which they assigned to Plaintiff. On January 20, 1990, they filed a Petition to Make Special pursuant to 37 C.F.R. § 1.102(d), alleging that an infringing product was already on the market, referring to Defendant's product here at issue. The Patent and Trademark Office ("PTO") issued a Notice of Allowance on April 22, 1992, and finally issued U.S. Patent Design No. 330,057. A utility patent (No.

---

1. The parting line refers to a line created by the blow-molding process.

5,158,152) was issued in the same month as well.

### C. *Defendant's Product*

Defendant, which operates under the name Fitness Quest, seeks to capitalize on popular products by manufacturing less expensive versions of various products. In early 1990, Defendant decided to manufacture its own version of the Step®. Jane Kmatz, a New Product Development assistant, purchased the home version of the Step® in August of 1990, and studied that product as well as the club version and other competing products. Defendant also maintained a "swap file" pertaining to Plaintiff's product as well as other competing products. Patriot Engineering drew a design for Defendant's product in September of 1990, and Jim Smith, a mechanical engineer, joined Defendant to assist in product development.

Defendants developed a smaller bench, approximately twenty-five inches long and four inches high, which may be adjusted in height by adding one or two two-inch risers, which are the same size and shape as the base bench unit. Like the Step®, Defendant's bench is made of high density polyethylene and is blow-molded. A black extruded plastic mat is placed onto the top of the bench, but unlike the Step® mat, it does not extend over the edge of the bench. The sides of Defendant's bench are symmetrically angled, though less sharply than the Step®'s asymmetrical angles, and the corners are rounded. The bench is textured, and the base unit is teal with the black mat, and one riser is gray and the other is pink.

Defendant points to several design differences between its product and the Step®. Defendant's product is smaller and uses single risers to adjust the height rather than requiring a set of smaller risers; the mat is placed on the top of the bench only and does not extend over any edge; the parting line of Defendant's bench is centered; and the contours of the sides and corners appear less aesthetically pleasing.

Defendant consulted with Attorney Michael Sand as to how to avoid infringing on Plaintiff's patent, and agreed to change the interlocking method by which the bench and risers joined and to avoid the use of the color purple. Defendant made its first sales in November of 1991 via infomercials, and later spread its sales channels to include direct mail, catalogs, and retail outlets. Like the Step®, Defendant's product was an immediate success.

Defendant entered into an agreement with Jane Fonda and LaFonda Partners pursuant to which Fonda endorsed the bench, which was then marketed as the Jane Fonda Step Aerobic and Abdominal Workout. Defendant and LaFonda Partners discussed various color schemes [2] but settled on teal and gray, with the later addition of the pink riser, because of market acceptance of those colors. Defendant filed a design patent application on January 14, 1992, and was notified by Plaintiff in December of 1992 that its bench infringed on the Step®. The PTO issued a notice of allowance on Defendant's application on August 11, 1993.

### D. *Confusion Between Plaintiff's and Defendant's Products*

Plaintiff and Defendant sell their respective products through a variety of channels, including on cable television and in catalogs, and the products compete directly in retail outlets such as Sportsmart, Sears, and Target. After Defendant's product was introduced, Plaintiff received a number of inquiries, complaints, and comments from its customers and Defendant's customers, suggesting that customers of both companies were confused as to whether Plaintiff was connected with Defendant's product. In November of 1993, Rose Ann Pott, an executive assistant employed by Plaintiff, visited an Athletic Shoe store and was surprised to see a poster which appeared to display the Step® and Reebok® footwear. Only on close inspection was Pott able to determine that the bench product displayed was not the Step® but rather Defendant's product.

**2.** LaFonda Partners retained the power to make the final decision as to the colors which would be used for the bench.

In a 1993 *Fitness Magazine* review of various bench products, Defendant's product was described as "a much shorter version" of the Step®.

Plaintiff commissioned a consumer survey in 1993 to determine the extent of consumer confusion. The research firm of Oxtoby–Smith, Inc., conducted a mall intercept survey in Philadelphia, Pennsylvania; Miami, Florida; Detroit, Michigan; and Los Angeles, California. Having selected an age and gender representative group of consumers who participate in aerobic exercise at least monthly and own aerobic exercise equipment or are likely to buy such equipment within six months to one year, the surveyors displayed the home version of the Step® and Defendant's product and asked the respondents whether they thought the products were put out by the same company or by two different companies. Thirty-six percent believed that the products were manufactured by the same company. Among those who used either the Step® or Defendant's product, thirty percent thought the products were made by the same company. Of those using neither product, forty percent believed the benches were produced by the same company.

Plaintiff has also submitted pictures of several other competing bench products. The products are notably distinct from both Plaintiff's and Defendant's product in shape, material, and color, with the only similarity found in every product being the generally rectangular shape of the bench. The court's attention is drawn particularly to the Weider "Body Shaping Adjustable Step," which is the only other blow-molded bench. The Weider step is made of black plastic and uses sharper contours on the sides and corners than do Plaintiff's and Defendant's products, and is supported by a single "I" shaped riser in contrast to Plaintiff's and Defendant's generally rectangular risers.

### E. *The Claim*

Plaintiff filed this action alleging that Defendant has infringed on its design patent and its trade dress, and that Defendant has engaged in common law unfair competition, and has violated the Georgia Uniform Decep-

tive Trade Practices Act. Defendant argues that Plaintiff's bench is *de jure* functional and therefore not protected, or, alternatively, that its design does not infringe on Plaintiff's patent or trade dress. Both parties have now moved for summary judgment.

### II. LEGAL DISCUSSION

### A. *Trade Dress Infringement*

Title 15, U.S.Code, § 1125 (section 43 of the Lanham Act), provides as follows:

(a)(1) Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

Plaintiff alleges that Defendant has infringed on its trade dress, thereby creating the confusion prohibited by § 43(a)(1). *See George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1535 (2d Cir.1992), *cert. denied,* 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992); *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 701 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). Trade dress includes "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *AmBrit v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir.1986). *See also Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615, 621 (1992); *Bauer Lamp Co., Inc. v. Shaffer,* 941 F.2d 1165, 1170 (11th Cir.1991); *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983). The design of the product itself as a whole may constitute its

trade dress. *Warner Bros. Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir.1981), *cited in John H. Harland Co.*, 711 F.2d at 980.

■ In order to prove trade dress infringement, a plaintiff must show first, that the trade dress is primarily non-functional. *Two Pesos*, 505 U.S. at 768–70, 112 S.Ct. at 2757–58, 120 L.Ed.2d at 624. If trade dress is primarily functional, it is unprotected. *Id.* *See also John H. Harland Co.*, 711 F.2d at 983–84; *Textron, Inc. v. United States International Trade Com.*, 753 F.2d 1019, 1024–25 (Fed.Cir.1985). The trade dress must also be either inherently distinctive or must have proof of secondary meaning.[3] *Two Pesos*, 505 U.S. at 768–73, 112 S.Ct. at 2757–60, 120 L.Ed.2d at 624–26; *Chevron*, 659 F.2d at 702.[4] Finally, the plaintiff must show the likelihood of confusion between the trade dress of the two products, viewed as through the eyes of a consumer in the marketplace. *Two Pesos*, 505 U.S. at 768–70, 112 S.Ct. at 2757–58, 120 L.Ed.2d at 624; *AmBrit*, 812 F.2d at 1541; *John H. Harland Co.*, 711 F.2d at 976; *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir.1980).

■ Defendant's evidence of functionality is insufficient to compel a conclusion that Plaintiff's trade dress is primarily functional and thus non-protectible. "[A] design is legally functional, and thus unprotectible, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." *Sicilia Di R. Biebow & Co.*, 732 F.2d at 426, quoted in *Two Pesos*, 505 U.S. at 773–76, 112 S.Ct. at 2759–61, 120 L.Ed.2d at 627–28. In determining whether a design is *de jure*

functional, the court must evaluate whether the design as a whole is as it is because it is "superior or optimal in terms of engineering, economy of manufacture, or accommodation of utilitarian function or performance." *Sicilia Di R. Biebow & Co.*, 732 F.2d at 429. *See also Textron, Inc.*, 753 F.2d at 1024–25; *In re R.M. Smith, Inc.*, 734 F.2d 1482, 1485 (Fed.Cir.1984); *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1338–40 (C.C.P.A.1982). However, "the determination of whether an overall design is functional should be based on the superiority of the design as a whole, rather than on whether each design feature is 'useful' or 'serves a utilitarian purpose.'" *Textron, Inc.*, 753 F.2d at 1026, quoting *In re Teledyne, Inc.*, 696 F.2d 968, 971 (Fed.Cir.1982). When trade dress need not be "slavishly copied" in order for a competitor to have a functionally equivalent product, the trade dress may be protected even though it is *de facto* functional, that is, it serves a function which may be served in a wide variety of ways. *Petersen Manufacturing Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1550 (Fed.Cir.1984); *In re Morton–Norwich*, 671 F.2d at 1340. *See also Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2186–87 n. 10, 72 L.Ed.2d 606 (1982).

■ The issue of functionality is a question of fact. *John H. Harland Co.*, 711 F.2d at 982; *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 775 (1981). While it is clear that at least certain features of the Step® are functional, it is not at all clear that the design, taken as a whole, is

---

**3.** Secondary meaning "is the connection in the consumer's mind between the mark and the provider of the [product]." *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1560 (11th Cir.1991). *See also AmBrit*, 812 F.2d at 1536 n. 14; *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir.1984). The court follows a four-factor test to determine whether trade dress has acquired a secondary meaning. The court must evaluate (1) the length and manner of use of the trade dress; (2) nature, extent, and effectiveness of advertising; (3) effort by plaintiff to promote a connection between the trade dress and plaintiff's business; and (4) the extent of consumers' actual identification of the trade dress with plaintiff. *Coach House Restau-*

*rant*, 934 F.2d at 1560. *See also Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir.1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970).

**4.** These categories of trade dress have been derived from the categories of trademarks, as established by Judge Friendly in *Abercrombie and Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). Trademark law has been applied analogously to the development of trade dress law. *See, e.g., Two Pesos*, 505 U.S. at 768–70, 112 S.Ct. at 2757–58, 120 L.Ed.2d at 624; *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 427 (5th Cir.1984).

functional. For instance, although the black mat is functional in that its nonskid surface provides an element of safety, and it provides a clear demarkation as to the safe stepping area, the fact that the mat is black, rather than some other color, and that it extends over the longitudinal edges of the bench despite certain problems with that feature suggests that it is in part non-functional.[5] The variety of competing products advanced to the court likewise would justify the conclusion that plaintiff's design, taken as a whole, is not *de jure* functional. Therefore, Plaintiff has introduced evidence sufficient to withstand Defendant's argument that its trade dress is functional and thus not protected by the Lanham Act.

■■■ Plaintiff's evidence regarding its sales and publicity of the Step® is more than sufficient to support a finding of inherent distinctiveness or secondary meaning and thus to survive Defendant's motion for summary judgment as to that issue. Defendant argues that the trade dress of the Step® is not inherently distinctive and that it has failed to acquire secondary meaning. Although Defendant has introduced evidence that Plaintiff has never attempted to promote any of the elements of the Step® to show the distinctiveness rather than the function of those elements, and although Defendant argues that all evidence of sales and publicity occurring after introduction of Defendant's product should be disregarded for the purpose of showing secondary meaning, Defendant's evidence is not such as would entitle it to summary judgment. While Defendant's

evidence that the features of the Step® are not inherently distinctive but rather are dictated by the mode of manufacture is entitled to some weight, Plaintiff has clearly introduced evidence sufficient to allow, but not so overwhelming as to require, a conclusion that the trade dress has acquired secondary meaning.

■■■ Similarly, Plaintiff has produced sufficient evidence to withstand any challenge as to the likelihood of confusion between the two products. *See AmBrit,* 812 F.2d at 1538 (listing factors to be considered in evaluating likelihood of confusion as: (1) strength of trade dress; (2) similarity of design; (3) similarity of product; (4) similarity of retail outlets and purchasers; (5) similarity of advertising media used; (6) defendant's intent; (7) actual confusion). *E. Remy Martin & Co., S.A. v. Shaw–Ross International Imports, Inc.,* 756 F.2d 1525, 1529–30 (11th Cir.1985); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 840 (11th Cir.1983); *Schmidt v. Honeysweet Hams, Inc.,* 656 F.Supp. 92, 96 (N.D.Ga. 1986).[6] Likewise, Defendant has introduced evidence sufficient to withstand Plaintiff's motion for summary judgment on the issue of likelihood of confusion by arguing that Plaintiff's trade dress is so weak as to merit little protection; that the similarity of design is insufficient to cause confusion;[7] that Defendant's intent was not to copy as closely as possible so as to trade on Plaintiff's good will;[8] and that Plaintiff's evidence of actual confusion is so flawed as to fail to support a finding that actual confusion existed.[9]

---

5. Defendant argues that the black color of the mat is likewise functional because black is the least expensive color to use, but Defendant provides no evidence which would show that the difference in cost between black and another color is significant. *See, e.g., Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 20 (7th Cir.1992) (holding that a feature is functional if it is costly to design around "in a way that will adversely affect a competitor's ability to produce and market a product of comparable price and quality").

6. Whether there exists likelihood of confusion is a question of fact. *John H. Harland Co.,* 711 F.2d at 972–73.

7. Defendant argues that such features as its single continuous riser as opposed to Plaintiff's twin

risers, and the placement of the black extruded mat on the top of the bench rather than extending also over the edges is sufficient differentiation between the products so as to avoid confusion.

8. *See AmBrit,* 812 F.2d at 1542 ("Finding that [defendant] adopted the trade dress with the intent of deriving benefit from the reputation of [plaintiff's product] may alone be enough to justify the inference that there is confusing similarity"); *John H. Harland Co.,* 711 F.2d at 977–78; *Chevron,* 659 F.2d at 704.

9. Specifically, Defendant challenges Plaintiff's survey results. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263–64 (5th Cir.1980), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66

For the foregoing reasons, neither Plaintiff's nor Defendant's motions for summary judgment as to trade dress infringement may succeed.

### B. *Common Law Unfair Competition and Georgia Uniform Deceptive Trade Practices Act*

The parties appear to agree, and the case law indicates, that the consideration of the common law unfair competition claim and Plaintiff's allegation that Defendant violated the Georgia Uniform Deceptive Trade Practices Act is co-extensive with the Lanham Act analysis. *See Jellibeans, Inc.,* 716 F.2d at 839; *Amstar Corp.,* 615 F.2d at 264. Therefore, because neither motion for summary judgment can succeed on Plaintiff's Lanham Act claims, summary judgment is likewise prohibited as to Plaintiff's state law claims.

### C. *Patent Infringement*

Title 35, U.S.Code, § 171, provides the basis for granting a design patent:

Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided.

Infringement of a design patent occurs when the patented design, or one substantially similar to it, is manufactured or sold without authority of the patent holder. 35 U.S.C. § 289. The Supreme Court has stated the test for design patent infringement as follows: "[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first patented is infringed by the other." *Gorham Co. v. White,* 81 U.S. (14 Wall.), 511, 528, 20 L.Ed. 731 (1871).

Defendant argues that the PTO's issuance of a Notice of Allowance as to its bench forecloses Plaintiff's infringement claim as a matter of law; that the design of Plaintiff's bench is primarily functional and not ornamental, so that the design patent is invalid; and finally, that its bench does not appropriate the ornamental features of Plaintiff's bench so as to be infringing.

#### 1. *Non–Obviousness*

■ Defendant argues first that because the PTO has issued a Notice of Allowance as to its bench, the PTO has determined that Defendant's bench is non-obvious in light of the prior art.[10] Defendant argues that the PTO's determination means that the ordinary observer would not find Defendant's product to be obvious as compared to Plaintiff's product, and that its product would therefore not cause confusion, so that it cannot be held to infringe. This argument is quickly dismissed. The Court of Claims and Patent Appeals, the predecessor to the Federal Circuit, has held that in determining non-obviousness for the purpose of patenting a design, the relevant point of view is that of the ordinary *designer,* "one who brings certain background and training to the problems of developing designs in a particular field," rather than that of the ordinary observer. *In re Nalbandian,* 661 F.2d 1214 (C.C.P.A. 1981), citing *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Consequently, in determining that Defendant's invention is non-obvious (and therefore cannot be confused with Plaintiff's product by the ordinary designer), the PTO applied a higher standard of inspection than that of the ordinary observer. This determination is therefore not probative of the question of whether an ordinary observer would confuse Defendant's design with Plaintiff's and whether Defendant's product thus infringes. Therefore, while it is possible that Defendant's product does not infringe on Plaintiff's design, the issuance of a Notice of Allowance does not compel that conclusion.

L.Ed.2d 129 (1980); *Exxon Corp. v. Texas Motor Exchange, Inc.,* 628 F.2d 500, 506 (5th Cir.1980).

**10.** *See* 35 U.S.C. § 103.

## 2. Functionality

■ Defendant also argues that Plaintiff's patent is invalid because it is primarily functional. Because the presumption of validity prescribed by 35 U.S.C. § 282 applies to design patents, Defendant bears the burden of proving that the patent is invalid due to functionality. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir.1993). The analysis of functionality in the patent context is similar to that applied in the context of trade dress, and summary judgment must be denied to both parties as previously discussed. However, the court will briefly review the law of functionality as applied to design patents.

■ A distinction exists between whether a product is itself functional and whether the design features of the product are functional. *Avia Group International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1563 (Fed.Cir.1988). It is only when the design of the article is dictated by the article's use or purpose that the article is "functional" and thus not patentable. *L.A. Gear, Inc.*, 988 F.2d at 1123. "In determining whether a design is primarily functional or primarily ornamental, the claimed design is viewed in its entirety, for the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article...." *Id.* See also *Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1189 (Fed.Cir.1988). As previously discussed, it is undisputed that certain features of Plaintiff's product are functional, but there exists a genuine question of material fact as to whether the design is, as a whole, dictated by function and not aesthetics. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 829 (Fed. Cir.1992).[11]

## 3. Likelihood of Confusion

Finally, Defendant argues that even if the patent is valid, it has not copied Plaintiff's design such that an ordinary observer might be confused. *See Read Corp.*, 970 F.2d at 826. However, as previously discussed, the court's review of the evidence compels the conclusion that an ordinary observer might well be confused due to the similarity of design.

## III. CONCLUSION

For the foregoing reasons, both Plaintiff's [14–1] and Defendant's [13–1] motions for summary judgment must be DENIED. The parties are hereby DIRECTED to submit their consolidated proposed pretrial order within thirty (30) days of the entry of this order.

---

11. Defendant argues that it has not appropriated the novelty of Plaintiff's product as it must for the fact-finder to find infringement. *L.A. Gear, Inc.*, 988 F.2d at 1125. However, Defendant then argues functionality and presents no evidence that it has not copied the novelty of Plaintiff's design. This argument, therefore, cannot succeed.