NEW ENGLAND BUTT CO., Appellant,

v.

INTERNATIONAL TRADE
COMMISSION, Appellee,

and

Kokubun, Inc., et al., Intervenors.

Appeal No. 83–1402.

United States Court of Appeals,
Federal Circuit.

March 12, 1985.

Norman S. Blodgett, Worcester, Mass., argued for appellant.

Jack M. Simmons, III, U.S. International Trade Commission, Washington, D.C., argued for appellee. With him on the brief were Michael H. Stein, Gen. Counsel and Michael P. Mabile, Asst. Gen. Counsel, Washington, D.C.

John W. Simpson, Kelley, Drye & Warren, Washington, D.C., argued for intervenor, Kokubun. With him on the brief were Francis Y. Sogi and Jeffrey S. Cook, Washington, D.C.

Before BALDWIN and KASHIWA, Circuit Judges, and NICHOLS, Senior Circuit Judge.

BALDWIN, Circuit Judge.

New England Butt Company appeals from the decision and order of the United States International Trade Commission (Commission) in Investigation No. 337–TA–130, Certain Braiding Machines, under 19 U.S.C. § 1337 (1982) (originally enacted as Tariff Act of 1930, Ch. 497, § 337, 46 Stat. 703) (hereinafter referred to as section 337), which prohibits unfair methods of competition in the importation of articles into the United States. The alleged unfair trade practice at issue is common law trademark infringement. The Commission ruled there was no violation of section 337. We affirm.

## I. *Background*

New England Butt, established in 1842, manufactures and sells textile equipment. Since 1884, it has manufactured and sold a maypole-type (maypole) braiding machine which is used in the textile industry to manufacture braided material. A maypole braider is so named because the path traced by bobbin carriers on the machine simulates that of dancers dancing around a maypole. New England Butt has made no major design change in its maypole braiders during the one hundred years it has manufactured these machines. The superstructure of the New England Butt braiding machine was the subject of a utility patent which expired in 1938.

New England Butt's Number Two braider is at issue in this case. The braider consists of a series of components, twenty-two of which comprise the alleged trademark. During the 1960's and 1970's Atlantic Braiding Machinery (Atlantic) manufactured and sold a braiding machine very similar to New England Butt's Number Two braider. Atlantic's customers requested that the parts for its braiders be interchangeable with the parts for New England Butt's Number Two braider. The Atlantic braider's resulting similarity in appearance to the New England Butt braider arose from the use of a number of similar components and assemblies, including the plate configuration, overall head configuration, vertical uprights, vertical drive shaft, crossbars, brackets, worm gear, and change gear assembly. Differences between the two machines included the drive system and shipper handle.

In 1966, Kokubun, Inc., one of the intervenors, began supplying parts to Atlantic for its braider. Originally, Atlantic supplied sample parts and specifications from which Kokubun produced parts. Later, in 1968, Kokubun began supplying Atlantic with the complete "base group" of the braider. The base group comprised the bulk of the Atlantic machine, everything from the top plate to the bottom plate.

Atlantic went out of business and New England Butt purchased Atlantic's assets. Soon thereafter, Kokubun began to import its braiding machines into the United States through a Canadian sales agent. In 1980, Kokubun engaged intervenor George Sabula as its United States sales representative.

Kokubun has been manufacturing maypole braiding machines since 1922 and has approximately fifty patents directed to braiding machine improvements. Kokubun's 2D braiding machine, sold directly to United States customers after Atlantic's demise, has almost exactly the same structural design as the Atlantic braider. Many parts of the Kokubun braider are interchangeable with parts of the New England Butt Number Two braider. The Kokubun machine also has features different from those of the New England Butt braider, including the change gear guard, stop motion device, take-off support arm, take-off rolls, ceramic former, and worm gear guard. Moreover, the Kokubun braider is prominently marked with the Kokubun name and the legend "Made in Japan."

New England Butt filed a complaint with the Commission alleging unfair competition, common law trademark infringement, false designation of origin, and passing off in violation of section 337 in the importation and sale of Kokubun's braiding machines. New England Butt alleged the existence of a common law trademark in the overall appearance of its braiding machine. During the prehearing conference, New England Butt waived all its allegations of unfair acts except for common law trademark infringement.

An Administrative Law Judge (ALJ) conducted a hearing and issued an initial determination which concluded, first, that New England Butt had not proved the existence of a common law trademark in the overall appearance of the braiding machine, second, assuming a trademark existed, there was no likelihood of confusion, and third, the acts complained of substantially injured an industry in the United States, but there is no prospective tendency to substantially injure the domestic industry. Because New England Butt prevailed only on the injury issue, the ALJ held there was no violation of section 337 in the importation and sale in the United States of Kokubun's braiding machines.

New England Butt petitioned the Commission for review of the initial determination. The Commission denied the petition and the subsequent petition for reconsideration. The initial determination thus became the determination of the Commission pursuant to 19 U.S.C. § 1335 (1982) and 19 C.F.R. § 210.53(h) (1984).

## II. *Issues*

On appeal, New England Butt contends that the Commission erred by determining that the appearance of its braiding machine is primarily functional, and that the braider's appearance is neither inherently distinctive nor distinctive for its having acquired secondary meaning. Further, New England Butt argues that the Commission erred by determining that no likelihood of confusion exists between New England Butt's Number Two braider and Kokubun's 2D braider, and that there is no tendency to substantially injure the relevant domestic industry. Finally, assuming *arguendo* that a trademark does not exist, New England Butt argues that Kokubun's alleged copying violates the "high level of moral conduct" imposed upon importers by section 337.

## III. *Opinion*

Section 337, in relevant part, declares unlawful: "Unfair methods of competition and unfair acts in the importation of articles * * *, the effect or tendency of which is to destroy or substantially injure an industry * * * in the United States." Thus, to prove a violation of section 337, the complainant must show both an unfair act and a resulting detrimental effect or tendency. The standard of review for the Commission's factual findings is the substantial evidence test. *SSIH Equipment, S.A. v. USITC,* 718 F.2d 365, 371, 218 USPQ 678, 684 (Fed.Cir.1983).

In reviewing the Commission's determination that there is no section 337 violation, our analysis first turns to whether the overall appearance of New England Butt's Number Two braider functions as a trademark, for without the existence of a trademark, there can be no unfair method or act that can lead to a violation of section 337.

New England Butt has not sought the protection offered by federal registration under the Lanham Act, 15 U.S.C. §§ 1051–1127, and therefore the Patent and Trademark Office has not determined whether trademark rights exist. The initial task of determining whether common law trademark rights exist in the braider's appearance therefore went to the Commission. Regardless of the forum, however, the standards governing what constitutes a common law trademark remain the same.

A trademark is defined in the Lanham Act as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127 (1982); In re Morton-Norwich Products, Inc., 671 F.2d 1332, 1336, 213 USPQ 9, 11 (CCPA 1982).

In Morton-Norwich, one of our predecessor courts traced the development of the law of trademark protection for designs of articles and containers or their features, and formulated the following standard: "One who seeks to register (or protect) a product or container configuration as a trademark must demonstrate that its design is 'nonfunctional,' * * * and that the design functions as an indication of source, whether inherently so, because of its distinctive nature, * * * or through acquisition of secondary meaning", id. at 1343, 213 USPQ at 17 (citations omitted) (emphasis added).

It is therefore a requirement that the appearance of New England Butt's Number Two braider be nonfunctional for there to exist the possibility of a protectable trademark in the braider's overall appearance. Textron, Inc. v. USITC, 753 F.2d 1019 at 1024 (Fed.Cir.1985). Functionality is a question of fact, Morton-Norwich, 671 F.2d at 1340, 213 USPQ at 15, and hence reviewable under the substantial evidence standard.

In Morton-Norwich, the court made a detailed analysis of how to determine whether a design is de jure functional or de facto functional, the distinction between the two categories of designs being that a de jure functional design cannot be protected as a trademark.[1] The mere fact that a particular feature or design may perform a function is not conclusive of whether that feature or design is de jure functional. 671 F.2d at 1338, 213 USPQ at 13–14.

However, to assert an overall product shape as a mark, the entire design must be non de jure functional or arbitrary. Textron, at 1025; Petersen Mfg. Co. v. Central Purchasing, Inc., 740 F.2d 1541, 1550, 222 USPQ 562, 569 (Fed.Cir.1984); In re Minnesota Mining & Mfg. Co., 335 F.2d 836, 840, 142 USPQ 366, 369 (CCPA 1964). The public policy underlying the rule that de jure functional designs cannot be protected as trademarks is, "not the right to slavishly copy articles which are not protected by patent or copyright, but, the need to copy those articles, which is more properly termed the right to compete effectively." Morton-Norwich, 671 F.2d at 1339, 213 USPQ at 14 (emphasis in original). See Textron, at 1025; Petersen Mfg. Co., 740 F.2d at 1550, 220 USPQ at 569; In re R.M. Smith, Inc., 734 F.2d 1482, 1484, 222 USPQ 1, 2–3 (Fed.Cir.1984). The court, in Morton-Norwich, said ultimately, " 'functionality' is determined in light of 'utility,' which is determined in light of 'superiority of design,' and rests upon the foundation 'es-

---

**1.** The court distinguished de facto functionality from de jure functionality on the basis that de facto functionality refers to "the use of 'functional' in the lay sense, indicating that although the design of a product, a container, or a feature of either is directed to performance of a func-tion, it *may* be legally recognized as an indication of source. De jure functionality ... would be used to indicate the opposite—such a design may not be protected as a trademark." 671 F.2d at 1337, 213 USPQ at 13.

sential to effective competition.'" 671 F.2d at 1340, 213 USPQ at 15 (citation omitted).

The court in *Morton-Norwich* then referred to a number of factors, "both positive and negative," which aid in the determination of whether a design is de jure functional. The court said, "the existence of an expired utility patent which disclosed the *utilitarian advantage of the design* sought to be registered[2] as a trademark was *evidence* that it was functional." 671 F.2d at 1340–41, 213 USPQ at 15 (citing *In re Shenango Ceramics, Inc.*, 362 F.2d 287, 291, 150 USPQ 115, 119 (CCPA 1966) (emphasis in original)). Other factors relevant to the determination of functionality are whether "the originator of the design touts its utilitarian advantages through advertising;" whether "there are other alternatives available;" and whether a particular design "results from a comparatively simple or cheap method of manufacturing." 671 F.2d at 1341, 213 USPQ at 15–16.

On the issue of functionality, New England Butt's main argument is that in its review of the twenty-two braider components, the Commission wrongly based its conclusion that the overall appearance of the Number Two braider is functional on the fact that all the components, as reflected in the machine's overall appearance, are de jure functional. New England Butt contends that since the individual components such as legs, drive pulley, and sickle-shaped bracket could assume different shapes and be manufactured of many materials, they are not dictated by function and are capable of serving as a trademark or as a portion of a trademark. New England Butt does not address the question of whether there is a trademark in the overall design or point out evidence showing that the overall design of the braiding machine is de jure nonfunctional. There is further, no argument by New England Butt that any of the Commission's findings on func-

tionality are unsupported by substantial evidence.

The ALJ did indeed examine the utilitarian nature of each of the twenty-two components claimed by New England Butt to constitute its trademark. However, the purpose of this examination was to determine the functionality of each feature as reflected in the machine's overall appearance. The Commission reviewed each of the relevant components and found that each component is functional or irrelevant for trademark purposes.[3] All but one of the findings were based on the testimony of one of New England Butt's witnesses. The Commission then analyzed the braider's overall configuration to see if the particular design is functional, by turning to the analysis set forth in *Morton-Norwich*, supra at 877–878.

The Commission found the superstructure of New England Butt's braider is the subject of an expired utility patent, U.S. Patent No. 1,389,672, which issued on September 6, 1921. The Commission said:

> The advance in the art represented by the subject device is explained in part [in the patent] as simplifying and lessening "the cost of construction of the different styles of [braiding] machines as all of the parts are rendered removable and interchangeable and any style of take-up or take-off head or mechanism may be applied thereto." * * * To the extent this patent describes the super-structure of the current New England Butt braiding machine, it is evidence of that mechanism's functionality.

New England Butt does not challenge the finding underlying this analysis.

■ As for the second *Morton-Norwich* evidentiary factor, the Commission found in New England Butt's advertising brochures and catalogs that New England Butt promotes the utilitarian features of the braider to its customer, but does not emphasize nonfunctional features or claim that nonfunctional features identify New

---

2. The factors cited apply equally to an asserted common law trademark.

3. Those features determined irrelevant for trademark purposes were the braider's color and some hidden casting marks.

England Butt as the source of the braider. Although New England Butt challenges this finding, our review of the record shows indeed a promotion of utilitarian features and we therefore conclude the finding is supported by substantial evidence.

■ Regarding the third *Morton-Norwich* factor, the Commission found New England Butt failed to show the existence of viable alternative braider designs. Only New England Butt and Kokubun sell this type of maypole braider in the United States, and the record is devoid of any evidence that commercially feasible alternative braider designs exist that could successfully compete with these braiders. The Commission said each feature was designed for reasons of economy and efficiency and hence alternative designs would not be commercially feasible. New England Butt's assertions to the contrary, that alternative designs exist, do not meet the burden of proof needed to overcome the Commission's finding. In our view, therefore, the Commission's finding is supported by substantial evidence.

Finally, as to the fourth *Morton-Norwich* factor, New England Butt's design results from a comparatively simple or cheap method of manufacture. Testimony of a New England Butt employee indicates that each feature of the braider was designed to be economical and efficient. The patented improvements on New England Butt's braider thus simplified and reduced the cost of the design.

*Morton-Norwich* emphasizes that functionality is to be determined in light of the competitive necessity to copy. 671 F.2d at 1339, 213 USPQ at 14. Accord, *In re Teledyne Industries, Inc.*, 696 F.2d 968, 971, 212 USPQ 9, 11 (Fed.Cir.1982). In the present case, the Commission found the design features and overall configurations of New England Butt's braider and the Kokubun 2D braider are required by competitive conditions in the market place. Kokubun was compelled by competitive necessity to copy because Kokubun's customers and customers of the now defunct Atlantic (Atlantic's parts being made by Ko-

kubun), insisted that their respective machine's parts be interchangeable with those of New England Butt. The Commission reasoned that one could conclude, based on such evidence, that it is competitively necessary for Kokubun to copy New England Butt's design features and overall configuration. We find no reason to disagree with the Commission's finding.

■ From a review of the entire record, we conclude that the Commission's finding that New England Butt's braiding machine design is de jure functional is supported by substantial evidence. Accordingly, we find no error in the Commission's determination that New England Butt has not established a common law trademark in the overall appearance of its braiding machine, or in the Commission's resulting order. In view of our functionality conclusion, we do not reach the other issues bearing on the existence of a trademark, namely, inherent distinctiveness and secondary meaning, or the other elements necessary to make out a section 337 violation, namely, likelihood of confusion, and tendency to substantially injure the domestic industry. We accordingly affirm the Commission's decision that section 337 is not violated.

Finally, we must address New England Butt's contention that a high level of commercial morality should be demanded of importers in view of section 337. The further argument is that importers are subject to higher standards of commercial conduct than domestic manufacturers. This higher standard, it is argued, accompanies the privilege of importation. However, importation requires no more than that the importer abide by the laws of this country. Section 337 does not imply any moral requirements like those alleged by New England Butt.

Accordingly, the determination of the United States International Trade Commission is *affirmed*.

AFFIRMED.