Hearing:
February 2, 2001

**THIS OPINION IS CITABLE
AS PRECEDENT OF
THE T.T.A.B.**

2 6 SEP 2001

Paper No. 29
RLS/CV

## UNITED STATES PATENT AND TRADEMARK OFFICE

### Trademark Trial and Appeal Board

M-5 Steel Mfg., Inc.
v.
O'Hagin's Inc.

Oppositions Nos. 109,470, 109,471 and 109,741
to applications Serial Nos. 75/177,079, 75/177,082 and
75/177,081, filed on October 4, 1996.

Jay S. Kopelowitz of Kopelowitz & Associates for M-5 Steel
Mfg., Inc.

William J. Arnone, Jr. for O'Hagin's Inc.

Before Simms, Wendel and Bottorff, Administrative Trademark
Judges.

Opinion by Simms, Administrative Trademark Judge:

M-5 Steel Mfg., Inc. (opposer), a California
corporation, has opposed the applications of O'Hagin's Inc.
(applicant), also a California corporation, to register the
following asserted product design marks for "metal roofing

tiles and metal ventilating ducts and vents for tile or concrete roofs."[1]





---

[1] Applications Serial Nos. 75/177,079, 75/177,082 and 75/177,081, all filed Oct. 4, 1996, based upon allegations of use and use in commerce since June 6, 1996. The applications were allowed after applicant overcame functionality refusals and submitted a claim of acquired distinctiveness under Section 2(f) of the Act, 15 USC §1052(f).



Applicant's specimens of record show applicant's roof vents installed on a roof of tiles. See below.



In all three notices of opposition, opposer asserts that applicant's designs are essentially the shape of its goods, which by necessity mirror the shapes of the roof tiles made and sold by various unrelated roof tile manufacturers. Opposer alleges that applicant's product designs do not function as marks but rather are essentially functional configurations consisting of design features which serve utilitarian purposes, the configurations being dictated by the function of the goods. Opposer also asserts that it makes and sells competing metal ventilating ducts and vents for tile and concrete roofs, the shape of which products is also dictated by the shape of the roof tiles made and sold by various roof tile companies.

In its answers, applicant denies the allegations of the notices of opposition, and claims that opposer's metal ventilating ducts and vents for tile and concrete roofs infringe applicant's trademarks. Moreover, applicant asserts as an affirmative defense that opposer is contractually estopped from opposing applicant's applications, that opposer has waived its rights to oppose and that opposer has breached an agreement by filing these oppositions.

During the course of these proceedings, the Board consolidated these cases. Both parties have filed notices of reliance on discovery, have taken testimony and

4

submitted briefs. An oral hearing was held at the Practising Law Institute California Center on February 2, 2001.

We sustain these oppositions.

## Opposer's Record

Douglas Linkon, opposer's vice president, testified that opposer makes sheet metal for the construction industry, including roof vents in many different styles. He stated that opposer manufactures vents that match the shape and contour of various tile roofs.

> Q. Do you know why the customer wants the vent to match the tile?
> A. For aesthetic reasons. Just for the look of it.
> Q. So it's not as obtrusive on the roof?
> A. Correct.

Linkon dep., 6.

Mr. Linkon further testified that opposer makes low-profile tile vents which resemble the low-profile vents made by applicant. In this regard, opposer makes so-called S-style vents (resembling the shape of the letter "S"), which look similar to the S-shaped roofing tiles with which they are used. These vents "match the shape and contour of the roof tiles so that they are not as obvious from the ground looking at the roof." Linkon dep., 8.

Mr. Victor Ponto, an employee of Cedar Roofing, a roofing company, testified about the manufacturers of so-called S tiles and S-style vents, the contoured vent

subject of Application Serial No. 75/177,082 and Opposition
No. 109,471. According to Mr. Ponto, there are many
manufacturers of S-shaped roofing tiles, and four
manufacturers of S-style vents for those roofs. He
testified that the shape of the vent may be made to look
like the contoured tile in connection with which it is
used.

Starting with the flat vent, the subject of
Application Serial No. 75/177,079 and Opposition No.
109,470, Mr. Ponto testified, pp. 14-20, as follows:

> Q. Mr. Ponto, I'm going to ask you to
> look back at Exhibit 22 [flat vent
> application]. I believe it's this one.
> I am going to ask you to look at the
> drawing page again which has an image in
> the middle. And when you see the image
> that's on Page 4 of Exhibit 22, do you
> immediately equate this image to a roof
> manufactured and sold by O'Hagin's
> [applicant].
> A. Can [you] rephrase that, just the last
> part 'cause it's not too clear to me.
> Q. Okay. When you see that image, okay,
> does that--what comes to mind?
> A. Well, it's a vent.
> Q. Does the manufacturer of the vent
> immediately come to mind as well?
> A. Not really. I wouldn't be able to
> tell what vent or what brand it is. It's
> just a vent to me so far.
> Q. Okay. Now, you know this case is
> about vents; right?
> A. Yes.
> Q. Okay. But when you see that image, do
> you immediately think of that as a vent
> or do you also think of that as a tile?
> A. Well, it reflects the tile. That's
> the whole purpose of the vent, I believe,
> to make it appear as a tile, a roof tile.
> Now, the flat vent does not reflect the

flat tile per se precisely as the other two molds or the other two vents do, but the low profile, the S tile, perhaps they reflect the tile more than the flat.

Q. Is that because the low profile and the S have more contours in them?

A. Precisely.

Q. Okay. Whereas, the flat is just that, flat?

A. It's just a flat piece of metal, yes.

Q. When you see the image--I am looking at Exhibit 23 [M-style vent shown on p. 3 above] now, the third page of the drawing sheet where there's an image in the middle-- I think that you said that's a low profile?

A. That is correct.

Q. Okay. When you see that image, do you --as you see it here right now, are you able to tell if that is an image of a vent or tile?

A. I could tell it's a vent at least when it's not--when it's not painted. Once it's on the roof, and it's painted, it's very difficult to identify them as either vent or tile. To the untrained eye, you can't really. It would appear that is another tile.

Q. It looks like the tile?

A. It looks like a tile.

Q. Is that the purpose of the vent?

A. I believe that's the purpose of the vent.

*****

Q. Let's take a look at Exhibit 24 [S-shaped vent above]. I believe it's the fourth page, and that's also the drawing sheet which has an image in the center, and I believe you've previously said that you believe that's an S shape?

A. That is an S shape.

Q. It's an S shape?

A. Yes.

Q. When you see that image as you see it right here, without knowing that this case is about roof vents, would you immediately think that that is a roof

7

vent or would you think it's a tile or both?

A. It would make me think at first glance that it would be two tiles together as the ones I showed you in the photographs. Once you establish a close examination of it, then you know that you can identify them as a vent.

Q. Are there an infinite variety of ways or shapes, I should say, that can be used to make a roof vent if the purpose of the vent is to match the shape and contour of the tile on the roof?

*****

Q. …What I'm asking is, in your opinion are there an infinite variety of shapes that can be used to make a roof vent if the purpose of that roof vent is to copy the shape and contour of the roof tiles?

*****

A. Yes. I believe that there is [sic] many shapes that could be used for the purpose of matching the contours of the tile. Perhaps it was desired to make sheet type of vents just to match the tile profiles.

Q. Let me ask you this. If I have a roof that has S tiles on it, and I want a vent that is going to match the shape and contour of the S tiles, will the top portion--can that top portion of the vent be any shape or does it have to be the shape of the S tiles?

*****

THE WITNESS: Yes. You can use any--any shape basically. There is a good number of dormer vents or roof vents, whichever way you want to call them, that could be used to ventilate the roofs or the attics.

Q. So you could use vents to ventilate?

A. Sure.

Q. But if your purpose is to match the shape and contour of the tiles so that the vent is not visible or noticeably visible from the ground, does the shape have to match the shape of the tile?

8

\* \* \* \* \*

THE WITNESS: The answer is yes.
Q. It does have to match the shape of the tile?
A. Yes.
Q. If that's the purpose of the vent?
A. Correct.

\* \* \* \* \*

Q. Do you know why O'Hagin roof vents imitate the roof tiles on the roof onto which they are installed?
MR. ARNONE: Objection. Calls for speculation. That's all.
THE WITNESS: I believe he's trying to -- O'Hagin is trying to match the contours of the tiles, the shape of the tiles that were used.
Q. So they're less visible?
MR ARNONE: Objection. Leading.
THE WITNESS: Perhaps that is the purpose of it.

In other words, Mr. Ponto testified that, by looking at the vent designs sought to be registered by applicant, he is not able to determine the manufacturer. Other companies besides the two involved in this proceeding make vents that resemble the ones in applicant's applications, according to Mr. Ponto. When asked if there are differences in the appearances of the S-style vents from one tile maker to another, Mr. Ponto said that he could not tell any such differences.

Opposer also points to copies of Mr. Harry O'Hagin's rejected utility patent application filed in 1992, included as evidence in applicant's trademark applications. In

those patent applications, Mr. O'Hagin indicated that one of the challenges faced by venting a tile roof was to ventilate "without destroying the integrity of the original roof design." No known devices ventilate properly "while still maintaining a desired aesthetic consistency with the roof covering material." In the summary of the invention in the application, Mr. O'Hagin stated:

> The inventive apparatus is shaped like a roof tile itself, and thus is inconspicuous and unobtrusive when installed. The inventive unit blends with the field and/or ridgeline tile, has no lead flanges to solder and will eliminate the cutting of tile for fitting, thereby enhancing the beauty of a tile roof while reducing labor costs and risks of leaks. The "invisibility" and simple procedure of installation allows the use of any number of units to fill any requirement…
> …The vent caps may be painted or otherwise fused with color to match the surrounding (standard) tiles…
> The vent tiles of this invention are easy to install and functional in design. They blend so unobtrusively with the building, preserving the beauty of the original design. The tiles will not present a fire hazard, and can be used on both new and restored buildings. The cost is comparable with standard ventilation systems, yet they are cheaper to install.

In Claim 1 of the rejected application, Mr. O'Hagin indicated that his method of ventilation includes "placing a tile-shaped vent cap over the vent base to blend with the installed roof tiles." Finally, in the "Abstract of the Disclosure," the patent applicant states that his roof vent "provides a vent tile shaped like a roof tile itself, and

10

thus is inconspicuous and unobtrusive when installed, and blends with the field and/or ridgeline tile."

Promotional literature in this record indicates that the "O'Hagin vents are made to fit the profile of all clay and concrete roof tiles currently produced for the roofing industry today." Letters submitted from people in the trade in support of applicant's Section 2(f) claim point to the fact that applicant's vents "look… like a piece of tile," "go well with every tile profile," and "is the only vent that blends in with the tile so as not to take away from the overall roof."

Applicant's Record

Mr. Harry O'Hagin, applicant's president, testified that applicant makes passive air metal ventilation products for clay and concrete tile roofs. Although opposer now also makes profile-specific vents for tile roofs, Mr. O'Hagin testified that applicant was the first company to develop such vents. Applicant does not sell roof tiles themselves—just the vents that are used with roof tiles. Applicant sells its products through distributors to roofing contractors.

When applicant's S-style vent is installed on a tile roof, the vents conform to the style and shape of the remaining tiles.

> The function is -- well, the function of
> the vent is to vent a roof. The function



> of our product is aesthetics,
> aesthetically pleasing. That's why we
> called it the cloaked vent.

O'Hagin testimony dep., p. 21. In other words, applicant's profile-specific vents are designed to match or blend in with the roof tile being used. See also O'Hagin discovery dep., pp. 56, 93 and 96, and O'Hagin testimony dep., p. 18.

> Q. Is the O'Hagin profile specific roof
> vent one of the best vents available with
> respect to camouflaging the vent on the
> roof?
> A. I believe it is.
> Q. Is it the best?
> A. It is.

O'Hagin discovery dep., pp. 112-113.

> Q. When you designed the profile specific
> vent, was it your goal to make a roof
> vent that was less visible by a roof?
> A. Yes.
> Q. Is O'Hagin's vent a superior design to
> achieve that goal?
> A. Yes.

O'Hagin discovery dep., pp. 74-75.

It is Mr. O'Hagin's belief that applicant has the right to exclude others from making competing profile-specific vents. O'Hagin discovery dep., p. 95. He testified that other designs are available.

> A. Well, if you can make a skeleton
> that fits the tile, then you have a
> specific profile, specific frame,
> then you can put any kind of top on
> it. You can put a square top on it,
> you can put a pointed top on it.
> You can put a different kind of
> material on it if you wish. You can
> cover it with another piece of tile.
> You can choose any shape you want to

12

> cover those two openings over the
> screen which my covers take the
> place of. That makes my tile a
> profile specific. So, yes, there's
> other ways you can do it.
> Q. Now, had you chosen one of those
> other shapes, isn't it true that it
> wouldn't match the contours of the
> roof tiles that are up there so that
> it would blend into the roof?
> A. Of course not.

O'Hagin discovery dep., p. 102. Exhibits, including applicant's promotional materials made of record in connection with O'Hagin's discovery deposition, support the testimony that applicant's venting tiles are shaped like roof tiles in order to blend in unobtrusively with the roof tiles. See, for example, Exhibits 5 and 7, "Suggested Architectural Specifications":

> The SECONDARY VENT is shaped like a roof
> tile itself which makes it inconspicuous
> and unobtrusive when installed. The
> O'HAGIN VENT blends with the field tile,
> has no soldered lead flanges and will
> eliminate the cutting of tile for fitting
> thereby enhancing the beauty of a tile roof
> while reducing labor costs and risks of
> leaks. The "invisibility" and simple
> installation procedure allows the uses of
> any number of units to fill any building
> ventilation requirements.

A November 1992 article appearing in SF Homebuilder & Remodeler (Exhibit 9) indicates that applicant's tiles

> are practically invisible to the naked
> eye… The O'Hagin Cloaked Vent Tile is
> also used in place of Dormer Vents which
> are more labor intensive to install.
> The cost is comparable with standard
> ventilation systems and they are cheaper
> to install.

13

See also Exhibit 16, an article entitled "Attic Ventilation? YES!," indicating that applicant's roof vents are "visually aesthetic" in that they are crafted to match the appearance of the roofing material.

Further, Mrs. Carolina O'Hagin, applicant's chief executive officer and chief financial officer, testified with respect to applicant's profile-specific vents that, "Once you put our vent on the roof, it blends in with the tile if it's painted properly and you can't see the vent, so therefore it's cloaked." O'Hagin dep., p. 10.

Applicant's goods are advertised at trade shows, in catalogues, magazines, in flyers, and on applicant's Web site. In applicant's 1998-99 fiscal year, approximately 230,000 vents were sold.

In support of its affirmative defenses of contractual estoppel, waiver and breach of agreement, applicant submitted the testimony of William Daniels, an attorney who represented applicant in a civil action brought by applicant against opposer in the U.S. District Court for the Central District of California. That litigation involved applicant's claim, as plaintiff, of palming off by opposer. After a motion for summary judgment was granted in that case, the parties settled the litigation by an October 30, 1997 "deal memorandum" (reproduced below).

Opposition Nos. 1●,470, 109,471 and 109,741  ●

To: Steven K Linkon
Fax: 714-720-9250
Re: O'Hagin-M-5 Settlement

Total Pages: 1

Remarks:

You represent to me that your client consents to a settlement on the following terms:
1. We ship 1,750 flat vents to Willis in 60 days, and pay you $20,000.00 cash in 90 days, in full satisfaction and as consideration for this settlement.
2. We dismiss case #95-6126 without prejudice.
3. You dismiss a case pending in Nevada against us and/or Harry O'Hagin with prejudice. You don't oppose our trademark applications.
4. We document the settlement with a form of release to be agreed.
5. Each side to bear its own costs and fees.
6. We notify the court of the settlement before the appearance required on Friday October 31, 1997.
You will sign and return a copy of this faxed memorandum today.

Yours truly,

Bill Daniels

Agreed: _____
Steven K. Linkon

CC: O'Hagin's

In April 1998, the parties entered into a final settlement of the civil litigation, more fully discussed below.

Opposer's Rebuttal

In rebuttal, Mr. Abelardo Lopez, the general manager of a roofing distributor, who has purchased roofing products from both parties, testified that both applicant and opposer make profile-specific roof vents. He testified that various manufacturers make roofing tile that resemble the vents sold by applicant. Mr. Lopez indicated that

15

applicant's vents are for ventilation as well as aesthetics

or "cosmetics."

> Q. When you say "cosmetics," what do you
> mean?
> A. Just for the looks, so it doesn't look
> as bulky as like a passive dormer vent.
> It has more of a nicer look when it's
> installed, more curb appeal. And it also
> vents at the same time.
> Q. You mentioned passive dormer vent. Can
> you describe in words what a passive dormer
> vent looks like and how it works?
> A. They come in different dimensions, and they
> are bulky, so they actually stick out of the
> roof, and they provide ventilation also.
> Q. So they are visible from the ground?
> A. They're visible, yes.
> Q. This is an S-vent, right--
> A. This is an S-vent.
> Q. --that we're looking at in Exhibit 24
> [applicant's drawing sheet]. Is this also
> visible when installed on a roof?
> A. Very lightly. Very lightly.

Arguments of the Parties

Essentially, opposer argues that it has standing

because it competes with applicant by selling profile-

specific roof vents which copy the shape and contour of

roof tiles. It is opposer's position that this record

demonstrates that applicant's designs sought to be

registered are functional configurations under *In re*

*Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9

(CCPA 1982). Opposer points to various admissions of

functionality made in applicant's unsuccessful utility

patent application and elsewhere that its roof vents are

cheaper to install than other vents, to applicant's touting

16

of the aesthetically pleasing design of its roof vents which blend in with other roof tiles, to applicant's president's admissions that he believes that applicant's roof vents are superior designs, and to the lack of alternative roof vent designs that are profile-specific. It is opposer's position that the functional advantages of applicant's designs, if exclusively appropriated by applicant as a result of trademark registrations, will deprive others of rights and will substantially hinder competition. Opposer argues that, if registrations are permitted, applicant would be able to exclude others from making roof vents that match the shape and contour of roof tiles, and that applicant will have an unlimited monopoly on profile-specific vents that far exceeds the benefits that a utility patent would have conferred. According to opposer, logic dictates that the shape of a roof vent which conforms to the shape of a roof tile made by others is an efficient and superior design.

With respect to the so-called "deal memo," upon which applicant's affirmative defenses are based, opposer argues that that agreement is not binding for several reasons. First, opposer argues that under California law, as interpreted by California courts, only the parties themselves rather than their attorneys may settle or

compromise a claim.[2] Because the parties did not sign the deal memo and because opposer's attorney must have been specifically authorized to settle and compromise a claim, which he was not, according to opposer, the deal memo is not binding. Even if the deal memo is construed as a settlement agreement, opposer argues that it is not enforceable because of the lack of consideration. Opposer's attorney states that nearly one-half year after the attorneys signed the deal memo, applicant had not yet shipped vents or paid opposer in accordance with the memo. Finally, opposer argues that the integration clause of the formal settlement agreement executed by the parties in April 1998 makes the deal memo irrelevant. In this regard, opposer points to the following language of the final settlement agreement:

> The parties acknowledge that there is
> [sic] pending three (3) trademark
> opposition proceedings before the
> Trademark Trials [sic] and Appeals
> [sic] Board, and that this Settlement
> Agreement and Mutual General Release
> does not extend to those proceedings.

---

[2] See Section 664.6 of the California Code of Civil Procedure:

> If parties to pending litigation stipulated,
> in a writing signed by the parties outside
> the presence of the court or orally before
> the court, for settlement of the case, or
> part thereof, the court, upon motion, may
> enter judgment pursuant to the terms of the
> settlement. If requested by the parties,
> the court may retain jurisdiction over the
> parties to enforce the settlement until
> performance in full of the terms of the
> settlement.

Paragraph 4.2.  This agreement also states:

> This agreement constitutes the entire
> agreement between the parties with
> respect to the subject matters referred
> to herein and supersedes all prior or
> contemporaneous understandings or
> agreements.

Paragraph 8.

Applicant, for its part, argues that its marks are not primarily functional.  Rather, applicant's designs, although aesthetically pleasing, serve the function of venting tile roofs.  Merely increasing the aesthetic appeal of a product, according to applicant, does not make its asserted marks *de jure* functional.

In support of its position, applicant argues that opposer has misapplied the *Morton-Norwich* factors. Applicant argues that it has no patent, expired or otherwise, describing the utilitarian advantages of the appearance of its roof vents.  Applicant's unsuccessful patent application claimed only the method of ventilating a roof, according to applicant.  While applicant admits that the patent application describes the appearance of its goods as being inconspicuous and unobtrusive, applicant argues that the functionality of its products does not rest in the visual appearance.  While applicant concedes that the appearance of its vent caps is stated to be aesthetically pleasing, applicant argues that it does not

tout any utilitarian functions of the appearance of its designs. Applicant points to Mr. O'Hagin's testimony concerning the numerous alternative designs available to competitors, and argues that registration to applicant will not hinder competition unfairly or prevent other manufacturers from selling their own styles of roof vents which perform the same function. Also, applicant contends that there is no advantage of cost or ease of manufacturing. Rather, the cost and difficulty in producing applicant's goods are greater, according to applicant's attorney.

Because applicant's marks are not *de jure* functional, applicant argues, they are registrable upon a showing of acquired distinctiveness. Applicant contends that its shapes have become distinctive by substantially exclusive and continuous use of its goods since June 1992. This, according to applicant, is prima facie evidence of acquired distinctiveness. Applicant also points to its promotional material and advertising expenditures.

Finally, applicant argues that, aside from the lack of substantive merit of opposer's case, opposer is contractually barred from contesting applicant's right to register. Applicant relies upon the "deal memo" which was signed by attorneys for these parties in the unrelated federal lawsuit. Because opposer initially agreed not to

object to applicant's applications, applicant argues that these oppositions should be dismissed. Contrary to opposer's contentions, applicant argues that opposer's counsel had authority to bind opposer to the terms of the agreement because a client is bound under the doctrine of apparent or ostensible authority. Applicant argues that the final settlement agreement, signed after these oppositions were filed, expressly excluded the pending oppositions from the effect of the integration clause in that agreement. Thus, according to applicant, the final agreement was not intended to speak to the issues under the jurisdiction of the Board or to dispose of applicant's affirmative defenses of contractual estoppel and waiver.

Opinion

There is no question but that opposer, a competitor of applicant in the roof vent business, has standing to oppose applicant's attempt to register these marks for roof vents. The real issues before us are whether opposer is contractually barred from bringing these oppositions; whether, if not, applicant's product designs are functional, as asserted by opposer; and whether, if not functional, applicant's product designs (which cannot be inherently distinctive as a matter of law, as explained below) have acquired distinctiveness so that they may be

registered on the Principal Register under the provisions

on Section 2(f) of the Act.

(1) Contractual Estoppel

We turn first to the issue of contractual estoppel, asserted as an affirmative defense. Our primary reviewing court, the Court of Appeals for the Federal Circuit, has discussed the place that claims of breach of contract play in Board proceedings. "[I]n the present case, although other courts would be the proper tribunals in which to litigate a cause of action for enforcement or breach of the contract here involved, that is not sufficient reason for the board to decline to consider the agreement, its construction, or its validity if necessary to decide the issues properly before it in this cancellation proceeding, including the issue of estoppel." *Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 217 USPQ 641, 647 (Fed. Cir. 1983). The Federal Circuit has made it clear that an agreement may be relevant and must be considered in Board proceedings. That Court's predecessor court, the Court of Customs and Patent Appeals (CCPA) held that the Board did not err when it held that a party was estopped from opposing an application to register the mark DANSHEER. *Danskin, Inc. v. Dan River, Inc.*, 498 F.2d 1386, 182 USPQ 370, 372 (CCPA 1974) ("Since DANSHEER is not one of the marks appellee agreed not to use (paragraph 11 of the

agreement) and appellee is not precluded from enforcing the settlement agreement, appellee is entitled to a judgment as a matter of law"). See also *Vaughn Russell Candy Co. v. Cookies in Bloom, Inc.*, 47 USPQ2d 1635, 1638 n. 6 (TTAB 1998). There, the Board noted that "[w]hile it does not lie within the jurisdiction of the Board to enforce the contract between the parties, agreements to cease use of a mark or to not use a mark in a certain format are routinely upheld and enforced."

The final settlement agreement specifically exempts these proceedings from its terms. Suffice it to say that because this final settlement agreement, by its terms, constitutes the entire agreement between the parties and supersedes all previous agreements including the so-called "deal memo," we believe that this letter agreement stating that opposer would not oppose these applications is no longer in effect.[3] We therefore find no contractual estoppel of opposer's claims.

(2) Functionality[4]

Concerning the central issue in these cases—that of functionality—we discuss first some basic legal principles

---

[3] Opposer's argument concerning the ineffectiveness of the deal memo because of the lack of consideration is unsupported. There is simply no evidence in this record of the failure of any consideration.

[4] The Trademark Act has recently been amended to provide explicitly that functionality is a ground of refusal if the mark "comprises any matter that, as a whole, is functional." See Section 2(e)(5) of the Act, 15 USC §1052(e)(5).

23

with respect to functionality as well as recent Supreme Court and Federal Circuit cases dealing with this issue.

A product feature is functional and cannot serve as a trademark if it is essential to the use or purpose of the article or it affects the cost or quality of the article. *Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 165, 34 USPQ2d 1161 (1995) and *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850, n. 10, 214 USPQ 1 (1982). In the context of a trademark infringement suit brought to protect unregistered trade dress, the Supreme Court has recently stated that the plaintiff in such a case must establish the non-functionality of the design, a showing that may involve consideration of its aesthetic appeal. *Wal-Mart Stores Inc. v. Samara Brothers Inc.,* 529 U.S. 205, 54 USPQ2d 1065, 1069 (2000). And even more recently, in a case decided after these oppositions were argued, the Court observed:

> This burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional… And in *Wal-Mart, supra,* we were careful to caution against misuse or over-extension of trade dress. We noted that "product design almost invariably serves purposes other than source identification"…
>
> Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as patent or copyright protects an item, it will be

24

> subject to copying. As the Court has
> explained, copying is not always
> discouraged or disfavored by the laws
> which preserve our competitive economy...

*TrafFix Devices Inc. v. Marketing Displays Inc.*, 532 U.S.

___, 58 USPQ2d 1001, 1005 (2001). Further, in *TrafFix*

*Devices,* 58 USPQ2d at 1007, the Court noted:

> The Lanham Act does not exist to reward
> manufacturers for their innovation in
> creating a particular device; that is the
> purpose of the patent law and its period of
> exclusivity. The Lanham Act, furthermore,
> does not protect trade dress in a functional
> design simply because an investment has been
> made to encourage the public to associate a
> particular functional feature with a
> singular manufacturer or seller.

Consumers should not be deprived of the benefits of

competition relating to the utilitarian and aesthetic

purposes that product design ordinarily serves by a rule of

law that facilitates plausible threats of suit against new

entrants based upon alleged distinctiveness. *Wal-Mart*

*Stores, supra,* at 1069.

In determining the functionality of a particular

product design, the Supreme Court has noted that a prior

patent has vital significance. It is strong evidence and

adds great weight to the presumption that the features

claimed are functional. *TrafFix Devices, supra,* 58 USPQ2d

at 1006. Moreover, it is not only the specific claims made

in the patent which are relevant; statements made in a

patent application and in the course of procuring a patent

25

also may demonstrate the functionality of the design. *Id.*

See also *In re Bose Corp.*, 772 F.2d 866, 227 USPQ 1 (Fed.

Cir. 1985); *New England Butt Co. v. International Trade*

*Commission,* 756 F.2d 874, 225 USPQ 260 (Fed. Cir. 1985);

*Morton-Norwich, supra; In re Visual Communications Co.,*

*Inc.,* 51 USPQ2d 1141 (TTAB 1999); *In re Edward Ski*

*Products, Inc.,* 49 USPQ2d 2001 (TTAB 1999); and *In re Oscar*

*Mayer & Co. Inc.,* 189 USPQ 295 (TTAB 1975).

This case seems to involve elements of both

utilitarian and aesthetic functionality. Here, for

example, there is evidence of utility in applicant's patent

application, as well as statements touting the superiority

of applicant's design in applicant's promotional

literature, and statements that applicant's design results

in reduced costs of installation. On the other hand, there

is no question that applicant's roof designs which match

the appearance of surrounding roof tiles are more pleasing

in appearance because the venting tiles in each case are

unobtrusive.

In this regard, the Supreme Court noted in *TrafFix*

*Devices,* 58 USPQ2d at 1006-7:

> As explained in *Qualitex, supra,* and *Inwood,*
> *supra,* a feature is also functional when it
> is essential to the use or purpose of the device
> or when it affects the cost or quality of the
> device. The *Qualitex* decision did not purport to
> displace this traditional rule. Instead, it
> quoted the rule as *Inwood* had set it forth. It

is proper to inquire into a "significant non-reputation-related disadvantage" in cases of aesthetic functionality, the question involved in *Qualitex.* Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature. In *Qualitex,* by contrast, aesthetic functionality was the central question, there having been no indication that the green-gold color of the laundry press pad had any bearing on the use or purpose of the product or its cost or quality.

And in *Qualitex,* the Court had approved of a statement from Restatement (Third) of Unfair Competition, Section 17, Comment c, 176 (1995), that the "ultimate test of aesthetic functionality is whether the recognition of trademark rights would significantly hinder competition."

In *Brunswick Corp. v. British Seagull Ltd.,* 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994), the Court of Appeals for the Federal Circuit reaffirmed the proposition that there is a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws. *Id.,* 32 USPQ2d at 1122. If a feature asserted as a trademark is the best, or at least one of a few superior designs for its purpose, competition is hindered. *See also Bose Corp., supra,* 227 USPQ at 6, and *In re Teledyne Industries Inc.,* 696 F.2d 968, 217 USPQ 9 (Fed. Cir. 1982).

In the *Brunswick* case, applicant sought to register the color black for outboard engines. We believe that what the Court said in that case has applicability to

27

applicant's attempt to register its roof vent designs in these cases:

> The color black, as the Board noted, does not make the engines function better as engines. The paint on the external surface of an engine does not affect its mechanical purpose. Rather, the color black exhibits both color compatibility with a wide variety of both colors and ability to make objects appear smaller. With these advantages for potential customers, the Board found a competitive need for engine manufacturers to use black on outboard engines. Based on this competitive need, the Board determined that the color was de jure functional. This court discerns no error in the Board's legal reasoning and no clear error in its factual findings.
>
> ....
> ...All outboard engine manufacturers color their products. These manufacturers seek colors that easily coordinate with the wide variety of boat colors. The Board found that the color black served this non-trademark purpose. In addition, the Board found that the color black serves the non-trademark purpose of decreasing apparent object size. The record showed that these features were important to consumers. Unlike the pink color in Owens-Corning [774 F.2d 1116, 227 USPQ 417 (Fed. Cir. 1985)], the Board found a competitive need for the color black. Thus, the Board concluded that registration of Mercury's proposed mark would hinder competition. This court discerns no clear error in the Board's findings.

*Brunswick Corp., supra,* 32 USPQ2d at 1122-23.

The Federal Circuit has made clear that traditional trademark principles govern the registrability of a proposed mark's aesthetic features. The test for

28

functionality hinges on whether registration of a particular feature hinders competition and not on whether the feature contributes to the product's commercial success. *Id.*, at 1124. That is, "[a]esthetic ingredients to commercial success are not necessarily de jure functional." *Id.* In the *Brunswick* case, color compatibility and the ability to decrease apparent engine size were not said to be mere aesthetic features. Rather, these features supplied a competitive advantage. See also *Deere & Co. v. Farmhand, Inc.*, 560 F.Supp. 85, 217 USPQ 252 (S.D. Iowa 1982), *aff'd,* 721 F.2d 253 (8th Cir. 1983) [per curiam] (color green was held to be "aesthetically functional" in that purchasers wanted their farm equipment to match); and *In re Ferris Corp.*, 59 USPQ2d 1587 (TTAB 2000)(pink or flesh color held functional for wound dressings).

Upon careful consideration of the legal precedent, this record and the arguments of the attorneys, we agree with opposer that applicant's product designs are functional in the sense that these configurations blend in or match the roof tiles with which they are used better than alternative products. As in *Brunswick,* these configurations do not make the roof vents work better because they are in these shapes. Rather, like the advantages of color compatibility and reduction in apparent

29

engine size afforded by the color black, applicant's designs are compatible with the roof tiles with which they are used and supply applicant with a competitive advantage in each case. Because applicant's vents match the contours of the roof vents with which they are used, alternatives will not have this advantage. Applicant's patent application and other evidence of record, including applicant's promotional literature and applicant's own testimony, tout the designs' unobtrusive appearance, state that they are "functional in design," camouflage the existence of the vents and are aesthetically pleasing. Applicant also represents in its promotional material that its vents are cheaper to install. We conclude that applicant's product designs are, as a whole, functional, and that registration by applicant would hinder competition by placing competitors at a substantial competitive disadvantage.

(3) Acquired Distinctiveness

Because applicant's designs are functional, any evidence of distinctiveness is of no avail to applicant in support of registration. See Section 2(f) of the Act; *TrafFix Devices, supra,* 58 USPQ2d at 1007; *R. M. Smith, supra,* 222 USPQ at 3; and *In re Deister Concentrator Co.,* 289 F.2d 496, 129 USPQ 314, 321 (CCPA 1961). Therefore, we logically need not reach the issue of acquired

distinctiveness. However, for the sake of completeness, we offer our opinion on this question as well. It is our view that, if applicant's product designs were not adjudged functional, then applicant has nevertheless failed to establish that its asserted marks have acquired distinctiveness.

First, we observe that, under *Wal-Mart, supra*, product designs are unregistrable (and unprotectable) unless they have acquired distinctiveness (or secondary meaning). In that case, the Court observed, 54 USPQ2d at 1069:

> In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.

See also *In re Ennco Display Systems*, 56 USPQ2d 1279 (TTAB 2000).

In the case before us, the record shows that there are at least three companies including opposer that produce roof vents substantially similar to applicant's vents. This alone would make it difficult for applicant to establish acquired distinctiveness. The record includes the testimony of an experienced roofer who was unable to distinguish applicant's vents from those of others. We infer from this testimony that the use by the other

31

companies of similar designs was of a sufficient nature to have an impact on the market. *Cf. L.D. Kichler Co. v. Davoil Inc.*, 192 F.3d 1349, 52 USPQ2d 1307 (Fed. Cir. 1999). Applicant cannot be said to have substantially exclusive use of these designs. Further, applicant has not submitted evidence that it has promoted the asserted product designs as trademarks, and we have no trial evidence that consumers have come to recognize applicant's designs as indications of origin. Also, while applicant's sales may demonstrate popularity or commercial success for its roof vents, such evidence alone does not demonstrate that the vents' designs which applicant seeks to register have become distinctive of its goods and thus function as source indicators. *See, e.g., In re Bongrain International (American ) Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) [growth in sales may be indicative of popularity of product itself rather than recognition of a term as denoting origin].

We conclude that applicant has not satisfied the burden it has of demonstrating acquired distinctiveness of its asserted marks.

Decision: The oppositions are sustained and registration to applicant is refused in each case.